**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

FILED
CLERK'S OFFICE

2001 NOV -1 P 3: 21

CIVIL ACTION NO.:

DISTRICT OF MASS.

# 04 - 12317 WGY

AMERICAN TOWER CORPORATION,
Plaintiff,

v.

J.L.B. CONSTRUCTION, INC., 21ST
CAPITAL CORPORATION, PRIME
COMMUNICATIONS, LLC, AMF
ELECTRICAL CONTRACTORS, INC.,
HEINZ CORPORATION, DANIEL
WENESS CONSTRUCTION,
WESTERN STATES TOWER, LLC,
WEST CENTRAL CONSULTING
SERVICES, INC., STEWART
ELECTRIC, INC., GLOBAL TOWER
SERVICE, ADVANCED LIGHTNING
TECHNOLOGY, INC. and GULF
COAST STEEPLEJACK,
Defendants.

RECEIPT #_____
AMOUNT $_____150.00_____
SUMMONS ISSUED____13____
LOCAL RULE 4.1_____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY. CLK____M.P._____
DATE_____11/1/04_____

MAGISTRATE JUDGE___RBC___

## COMPLAINT

## INTRODUCTORY STATEMENT

This is a civil action for: (i) interpleader brought pursuant to Rule 22 of the

Federal Rules of Civil Procedure and 28 U.S.C. § 1335; (ii) breach of contract;

(iii) fraud; (iv) indemnification and contribution; and (v) declaratory relief, arising

from a Master Contractor Agreement, entered into on or about January 1, 2003,

related to various tower construction projects at twenty-two (22) tower sites

located throughout the United States, which were leased by the Plaintiff

American Tower Corporation or owned or leased by a third-party customer of the Plaintiff.

### PARTIES

1.    The Plaintiff American Tower Corporation (the "Plaintiff" or "American Tower") is a corporation incorporated under the laws of the State of Delaware having its principal place of business at 116 Huntington Avenue, Boston, Massachusetts 02116.

2.    The Defendant J.L.B. Construction, Inc. ("JLB" or the "Contractor") is a corporation incorporated under the laws of the State of Iowa having its principal place of business at 1030 Donna Street, Denver, Iowa 50622, with a former address of 241 West Franklin Street, Denver, Iowa 50622.

3.    The Defendant 21st Capital Corporation ("Capital") is a corporation incorporated under the laws of the State of California having its principal place of business at 23852 Pacific Coast Highway, #600, Malibu, California 90265.

4.    The Defendant Prime Communications, LLC ("Prime") is a corporation incorporated under the laws of the State of Missouri having its principal place of business located at 6716 Graden Road, Parkville, Missouri 64152.

5.    The Defendant AMF Electrical Contractors, Inc. ("AMF") is a corporation incorporated under the laws of the State of Missouri having its principal place of business located at 1627 Sublette Avenue, St. Louis, Missouri 63110.

6.    The Defendant Heinz Corporation ("Heinz") is a corporation incorporated under the laws of the State of Missouri having its principal place of business located at 804 Lebanon Drive, St. Louis, Missouri 63104.

2

7.    The Defendant Daniel Weness Construction ("Weness") is a corporation incorporated under the laws of the State of Minnesota having its principal place of business located at 11384 790th Avenue, LeRoy, Minnesota 55951.

8.    The Defendant Western States Tower, LLC ("WST") is a corporation incorporated under the laws of the State of Nevada having its principal place of business located at 1475 Terminal Way #A-5, Reno, Nevada 89502.

9.    The Defendant West Central Consulting Services, Inc. ("WCCS") is a corporation incorporated under the laws of Texas having its principal place of business at 23302 Margerstadt, Hockley, Texas 77447.

10.    The Defendant Global Tower Service ("Global") is a corporation incorporated under the laws of the State of Illinois having its principal place of business located at 810 34th Avenue, Moline, Illinois 61265.

11.    The Defendant Advanced Lightning Technology, Ltd. ("Advanced") is a corporation incorporated under the laws of the State of Texas having its principal place of business located at 122 Leesley Lane, Argyle, Texas 76226.

12.    The Defendant Gulf Coast Steeplejack ("Gulf Coast") is a corporation incorporated under the laws of the State of Texas having its principal place of business located at 1994 FM 356 N, Onalaska, Texas 77360.

## JURISDICTION

13.    The United States District Court for the District of Massachusetts has proper jurisdiction over this matter by reason of complete diversity of citizenship of the party corporations and the jurisdictional amount in controversy.  28

3

U.S.C.A. § 1332 and § 1335. The matter in controversy exceeds, exclusive of interest and costs, Seventy-Five Thousand Dollars and 01/100 ($75,000.01).

### FACTUAL BACKGROUND

### I.    The Master Contractor Agreement

14.    The Plaintiff American Tower is the parent company of ATC Tower Services, Inc. ("ACS"), a subsidiary corporation incorporated in New Mexico having its principal place of business in the Commonwealth of Massachusetts, which provides construction and development services for wireless and broadcast communication towers leased by American Tower or owned or leased by third-party customers of American Tower.

15.    On or about January 1, 2003, the Plaintiff American Tower, on behalf of ACS, and the Defendant JLB entered into a Master Contractor Agreement (the "Agreement") whereby JLB agreed to provide general contracting services to ACS and American Tower at twenty-two (22) tower sites (the "Sites") located in various states across the United States. A true and correct copy of the Agreement is attached hereto as *Exhibit 1.*

16.    Under the Agreement, a schedule and purchase order (collectively, the "Purchase Orders") was produced for each site designating the site, the work to be completed and the contract price. True and correct copies of the Purchase Orders are attached hereto as *Exhibit 2.*

17.    Under Article 7 of the Agreement, the Defendant JLB agreed to participate in and oversee the performance and completion of work at each of the Sites.

4

18.    Under Article 9.1 of the Agreement, American Tower agreed to pay JLB

for the completion of the Work at each of the Sites.[1]

19.    Pursuant to Article 4.7.1 of the Agreement, JLB was given the authority to

hire subcontractors in order to complete the work at each of the Sites in

exchange for payment by ACS to JLB and by JLB to the subcontractors for all

work completed, so long as permission of the Plaintiff was granted in writing with

regard to the hiring of the particular subcontractor pursuant to Article 6.3 of the

Agreement.

20.    JLB is responsible for all payments to the subcontractors for work

performed at the Sites.

21.    American Tower reserved the right, pursuant to Articles 4.7.2 and 4.7.3 of

the Agreement, to make payments to a subcontractor directly in the event that

JLB failed to pay any subcontractor as promised.[2]

22.    The Agreement (Article 4.7.3) states further that JLB will reimburse

American Tower for "all costs of collection, including but not limited to,

reasonable attorneys' fees, collection fees and court costs incurred by [American

Tower] to collect properly due payments, or payments due and owing to

subcontractors....".

---

[1] The Agreement calls for Eighty-Five Percent (85%) of the "Contract price (sic) [to] be paid upon satisfaction of the following:  (a) completion of the relevant Work, (b) inspection and approval by [American Tower's] representative of the relevant Work, (c) acceptance of the relevant work by [American Tower], (d) receipt by [American Tower] of Contractor's invoice for the relevant Work, (e) receipt by [American Tower] of all required releases, waivers of liens and other documents listed in the Contract Documents, and (e) (sic) no claims, stop notices or liens arising out of the relevant Work have been made or remain in effect."

[2] The Agreement (Article 4.7.2) states that "if [American Tower] has reason to believe that Contractor is not timely paying its subcontractors, Contractor agrees that [American Tower] shall have the right to make any payment due Contractor hereunder jointly to Contractor and to any person, subcontractor, supplier or other entity to whom Contractor is indebted for labor performed or materials furnished in the performance of the Work."

## II.    The Purchase Orders, Sites and Subcontractors

*The Bayou LaBatre Site*

23.    The Contract Price from ACS to JLB for the Bayou LaBatre site in

Irvington, Alabama[3] was Seventeen Thousand Five Hundred Dollars

($17,500.00).

24.    Prime, the subcontractor hired by JLB to perform work on the Bayou

LaBatre site, is allegedly owed Sixteen Thousand One Hundred Dollars

($16,100.00) for that site.

25.    In order to complete the project at the Bayou LaBatre site, ACS spent an

additional Three Thousand Dollars ($3,000.00).

26.    To date, neither JLB, nor Prime, has been paid by ACS for the Bayou

LaBatre site.

*The Chapel Church Site*

27.    The Contract Price from ACS to JLB for the Chapel Church site in Grand

Bay, Alabama[4] was Seventeen Thousand Dollars ($17,000.00).

28.    Piedmont[5] and RSC[6], the subcontractors hired by JLB to perform work on

the Chapel Church site, were paid Nine Thousand Six Hundred Dollars

($9,600.00) and Two Thousand Five Hundred Fifty-Five Dollars and 85/100

($2,555.85), respectively, by ACS for that site.

29.    In order to complete the project at the Chapel Church site, ACS spent an

additional Nine Hundred Dollars ($900.00).

---

[3] Also referenced in the Plaintiff's documents as Project # 22792 and Purchase Order # 54318.
[4] Also referenced in the Plaintiff's documents as Project # 22791 and Purchase Order # 54321.
[5] Piedmont is not a party to this action.
[6] RSC is not a party to this action.

30.    To date, the subcontractors have been paid Twelve Thousand One Hundred Fifty-Five Dollars and 85/100 ($12,155.85) by ACS for the Chapel Church site.

*The China Wok Site*

31.    The contract price from ACS to JLB for the China Wok site in Rock Hill, Missouri[7] was Six Thousand Five Hundred Dollars ($6,500.00).

32.    Prime, the subcontractor hired by JLB to perform work on the China Wok site, is allegedly owed Four Hundred Fifty Dollars ($450.00) for that site.

33.    In order to complete the project at the China Wok site, ACS spent an additional One Hundred Seventy-Five Dollars ($175.00).

34.    To date, ACS has paid JLB Six Thousand Five Hundred Dollars ($6,500.00) for the China Wok site.

*The Claiborne Site*

35.    The contract price from ACS to JLB for the Claiborne site in Gosport, Alabama[8] was Eighteen Thousand Dollars ($18,000.00).

36.    Global, the subcontractor hired by JLB to perform work on the Claiborne site, was paid Ten Thousand Nine Hundred Fifty Dollars ($10,950.00) by ACS for that site.

37.    In order to complete the project at the Claiborne site, ACS spent an additional Three Thousand Six Hundred Dollars ($3,600.00).

38.    To date, Global has been paid Ten Thousand Nine Hundred Fifty Dollars ($10,950.00) by ACS for the Claiborne site.

---

[7] Also referenced in the Plaintiff's documents as Project # 22680 and Purchase Order # 50639.
[8] Also referenced in the Plaintiff's documents as Project # 22799 and Purchase Order # 52365.

*The Cleveland Site*

39.    The contract price from ACS to JLB for the Cleveland site in Cleveland,

Mississippi[9] was Nineteen Thousand Eight Hundred Dollars ($19,800.00).

40.    WCCS, Stewart, Advanced and Prime, the subcontractors hired by JLB to

perform work on the Cleveland site, have presented unpaid claims to ACS for

Twenty Four Thousand Eight Hundred Dollars ($24,800.00), One Thousand

Thirty-Three Dollars and 62/100 ($1,033.62), Five Thousand Six Hundred Ninety

Dollars and 89/100 ($5,690.89) and Three Thousand Five Hundred Seventy-Six

Dollars and 50/100 ($3,576.50), respectively, for that site.

41.    On information and belief, Gulf Coast performed work at the Cleveland

site pursuant to an agreement with WCCS and may be owed money for the work

performed at the site.

42.    To date, none of the parties have been paid by ACS for the Cleveland site.

*The Columbus Site*

43.    The contract price from ACS to JLB for the Columbus site in Columbus,

Mississippi[10] was Seven Thousand Dollars ($7,000.00).

44.    WST and Prime, the subcontractors hired by JLB to perform work at the

Columbus site, are allegedly owed Four Thousand One Hundred Thirty-Five

Dollars ($4,135.00) and Four Thousand Two Hundred Sixty-Five Dollars and

50/100 ($4,265.50), respectively, for that site.

---

[9] Also referenced in the Plaintiff's documents as "G523", Project #22840 and Purchase Order #52634.

[10] Also referenced in the Plaintiff's documents as "C501", Project #22842 and Purchase Order #52812.

45.    To date, ACS has paid JLB Seven Thousand Dollars ($7,000.00) for the
Columbus site.

*The Forney Site*

46.    The contract price from ACS to JLB for the Forney site in Forney, Texas[11]
was Twenty Six Thousand Dollars ($26,000.00).

47.    TNT Electric[12] and Americrane[13], the subcontractors hired by JLB to
perform work at the Forney site, were paid Seventeen Thousand Five Hundred
Dollars ($17,500.00) and Two Thousand One Hundred Dollars ($2,100.00),
respectively, by ACS for that site.

48.    To date, ACS has paid TNT Electric and Americrane Nineteen Thousand
Six Hundred Dollars ($19,600.00) for the Forney site.

*The Fowl River Site*

49.    The contract price from ACS to JLB for the Fowl River site in Mobile,
Alabama[14] was Eighteen Thousand Dollars ($18,000.00).

50.    Prime and Global, the subcontractors hired by JLB to perform work at the
Fowl River site, are allegedly owed Thirteen Thousand Seven Hundred Dollars
($13,700.00) and One Thousand Five Hundred Dollars ($1,500.00), respectively,
for the site.

51.    In order to complete the project at the Fowl River site, ACS spent an
additional Three Thousand Six Hundred Dollars ($3,600.00).

---

[11] Also referenced in the Plaintiff's documents as Project #23651 and Purchase Order #55437.
[12] TNT Electric is not a party to this action.
[13] Americrane is not a party to this action.
[14] Also referenced in the Plaintiff's documents as Project #22793 and Purchase Order #53776.

52.    To date, none of the parties have been paid by ACS for the Fowl River site.

*The Graytak Site*

53.    The contract price from ACS to JLB for the Graytak site in Pine Lawn, Missouri[15] was Nineteen Thousand Five Hundred Dollars ($19,500.00).

54.    AMF, one of the subcontractors hired by JLB to perform work at the Graytak site, was paid Fifteen Thousand Eight Hundred Dollars ($15,800.00) by ACS for that site.

55.    Prime, one of the subcontractors hired by JLB to perform work at the Graytak site, is allegedly owed a total of Six Thousand Eight Hundred Fifty Dollars ($6,850.00) for that site.

56.    In order to complete the project at the Graytak site, ACS spent an additional Three Thousand Five Hundred Five Dollars ($3,505.00).

57.    To date, ACS has paid AMF Fifteen Thousand Eight Hundred Dollars ($15,800.00) for the Graytak site.

*The Hwy 25N Site*

58.    The contract price from ACS to JLB for the Hwy 25N site in Sturgis, Mississippi[16] was Nine Thousand Dollars ($9,000.00).

59.    WST and Prime, the subcontractors hired by JLB to perform work at the Hwy 25N site, are allegedly owed One Thousand Five Hundred Dollars ($1,500.00) and Eight Thousand One Hundred Dollars ($8,100.00), respectively, for that site.

---

[15] Also referenced in the Plaintiff's documents as Project #21785 and Purchase Order #50637.
[16] Also referenced in the Plaintiff's documents as "C554", Project #22768 and Purchase Order #54855.

60.    To date, none of the parties have been paid by ACS for the Hwy 25N site.

*The I-59N Site*

61.    The contract price from ACS to JLB for the I-59N site in Hattiesburg, Mississippi[17] was Six Thousand Dollars ($6,000.00).

62.    WST, the subcontractor hired by JLB to perform work at the I-59N site, is allegedly owed Four Thousand Two Hundred Dollars ($4,200.00) for that site

63.    To date, ACS has paid JLB Six Thousand Dollars ($6,000.00) for the I-59N site.

*The Lado Road Site*

64.    The contract price from ACS to JLB for the Lado Road site in Zephyrhills, Florida[18] was Five Thousand Dollars ($5,000.00).

65.    Daniel Weness, the subcontractor hired by JLB to perform work at the Lado Road site, is allegedly owed Three Thousand Eight Hundred Dollars ($3,800.00) for that site.

66.    To date, ACS has paid JLB Five Thousand Dollars ($5,000.00) for that site.

*The Lake Site*

67.    The contract price from ACS to JLB for the Lake site in Lake Wales, Florida[19] was Five Thousand Dollars ($5,000.00).

---

[17] Also referenced in the Plaintiff's documents as "H524", Project #22847 and Purchase Order #52635.

[18] Also referenced in the Plaintiff's documents as "T114", Project #22186 and Purchase Order #50271.

[19] Also referenced in the Plaintiff's documents as "LO34", Project #22160 and Purchase Order #49841.

68.    Daniel Weness and WST, the subcontractors hired by JLB to perform work at the Lake site, were paid One Thousand Nine Hundred Dollars ($1,900.00) each by ACS for that site.

69.    To date, ACS has paid Daniel Weness and WST Three Thousand Eight Hundred Dollars ($3,800.00) for the Lake site.

*The Lutz Site*

70.    The contract price from ACS to JLB for the Lutz site in Lutz, Florida[20] was Five Thousand Dollars ($5,000.00).

71.    Daniel Weness, the subcontractor hired by JLB to perform work at the Lutz site, was paid Three Thousand Eight Hundred Dollars ($3,800.00) by ACS for that site.

72.    To date, ACS has paid Daniel Weness Three Thousand Eight Hundred Dollars ($3,800.00) for the Lutz site.

*The Mauvilla Site*

73.    The contract price from ACS to JLB for the Mauvilla site in Eight Mile, Alabama[21] was Eighteen Thousand Dollars ($18,000.00).

74.    WST and RSC[22], the subcontractors hired by JLB to perform work at the Mauvilla site, were paid Seven Thousand Two Hundred Dollars ($7,200.00) and Two Thousand Nine Hundred Twenty-Five Dollars and 45/100 ($2,925.45), respectively, by ACS for that site.

---

[20] Also referenced in the Plaintiff's documents as "T031", Project #22163 and Purchase Order #49840.
[21] Also referenced in the Plaintiff's documents as Project #22794 and Purchase Order #53334.
[22] RSC is not a party to this action.

75.    In order to complete the project at the Mauvilla site, ACS spent an additional Two Thousand Seven Hundred Dollars ($2,700.00).

76.    To date, ACS has paid WST and RSC Ten Thousand One Hundred Twenty-Five Dollars and 45/100 ($10,125.45) for the Mauvilla site.

*The Milton East Site*

77.    The contract price from ACS to JLB for the Milton East site in Milton, Florida[23] was Eight Thousand Five Hundred Dollars ($8,500.00).

78.    Global, the subcontractor hired by JLB to perform work at the Milton East site, was paid Four Thousand Eight Hundred Dollars ($4,800.00) by ACS for that site.

79.    In order to complete the project at the Milton East site, ACS spent an additional One Thousand Two Hundred Dollars ($1,200.00).

80.    To date, ACS has paid Global Four Thousand Eight Hundred Dollars ($4,800.00) for the Milton East site.

*The MLK Site*

81.    The contract price from ACS to JLB for the MLK site in Wellston, Missouri[24] was Eight Thousand Five Hundred Dollars ($8,500.00).

82.    Prime, AMF and Heinz, the subcontractors hired by JLB to perform work at the MLK site, are allegedly owed Seven Thousand One Hundred Fifty Dollars ($7,150.00), Seven Hundred Sixty-Five Dollars ($765.00) and Eight Thousand Two Hundred Dollars ($8,200.00), respectively, for that site.

---

[23] Also referenced in the Plaintiff's documents as Project #22886 and Purchase Order #53781.

[24] Also referenced in the Plaintiff's documents as Project # 21735 and Purchase Order #50640.

83.    In order to complete the project at the MLK site, ACS spent an additional Two Thousand Four Hundred Ninety-One Dollars ($2,491.00).

84.    To date, ACS has paid JLB Eight Thousand Five Hundred Dollars ($8,500.00) for the MLK site.

*The Nacogdoches Site*

85.    The contract price from ACS to JLB for the Nacogdoches site in Abilene, Texas[25] was Twenty-Six Thousand Dollars ($26,000.00).

86.    TNT Electric[26], the subcontractor hired by JLB to perform work at the Nacogdoches site, was paid Twenty One Thousand Two Hundred Three Dollars ($21,203.00) by ACS for the site.

87.    To date, ACS has paid TNT Electric Twenty-One Thousand Two Hundred Three Dollars ($21,203.00) for the Nacogdoches site.

*The Nordyne-B Site*

88.    The contract price from ACS to JLB for the Nordyne-B site in St. Louis, Missouri[27] was Thirteen Thousand One Hundred Dollars ($13,100.00).

89.    AMF, the subcontractor hired by JLB to perform work at the Nordyne-B site, is allegedly owed Eleven Thousand Four Hundred Forty-Nine Dollars ($11,449.00) for that site.

90.    In order to complete the project at the Nordyne-B site, ACS spent an additional Three Hundred Fifty-One Dollars ($351.00).

91.    To date, ACS has paid JLB Thirteen Thousand One Hundred Dollars ($13,100.00) for the Nordyne-B site.

---

[25] Also referenced in the Plaintiff's documents as Project #23649 and Purchase Order #56183.
[26] TNT Electric is not a party to this action.
[27] Also referenced in the Plaintiff's documents as Project #21765 and Purchase Order #53233.

*The Roofers Supply Site*

92.    The contract price from ACS to JLB for the Roofers Supply site in St. Louis, Missouri[28] was Eight Thousand Five Hundred Dollars ($8,500.00).

93.    AMF, one of the subcontractors hired by JLB to perform work at the Roofers Supply site, was paid One Thousand Fifty-Five Dollars ($1,055.00) by ACS for that site.

94.    Prime, one of the subcontractors hired by JLB to perform work at the Roofers Supply site, is allegedly owed Nine Thousand Three Hundred Fifty Dollars ($9,350.00) for that site.

95.    In order to complete the work at the Roofers Supply site, ACS spent an additional One Thousand Two Hundred Twenty-Eight Dollars ($1,228.00).

96.    To date, ACS has paid AMF One Thousand Fifty-Five Dollars ($1,055.00) for the Roofers Supply site.

*The Sunflower Site*

97.    The contract price from ACS to JLB for the Sunflower site in Sunflower, Mississippi[29] was Twenty Five Thousand Dollars ($25,000.00).

98.    WCCS, Stewart and Prime, the subcontractors hired by JLB to perform work at the Sunflower site, have presented unpaid claims to ACS for Thirty-Six Thousand Six Hundred Five Dollars ($36,605.00), Eight Thousand Two Hundred Eighty-Two Dollars and 50/100 ($8,282.50) and Six Thousand Two Hundred Nineteen Dollars and 50/100 ($6,219.50), respectively.

---

[28] Also referenced in the Plaintiff's documents as Project #22552 and Purchase Order #50642.
[29] Also referenced in the Plaintiff's documents as "G580", Project #22770 and Purchase Order #52632.

99.    On information and belief, Gulf Coast performed work at the Sunflower site pursuant to an agreement with WCCS and may be owed money for the work performed at the site.

100.    To date, none of the parties have been paid by ACS for the Sunflower site.

*The Sunflower Site Modifications*

101.    The contract price from ACS to JLB for the modifications[30] to the Sunflower site[31] in Sunflower, Mississippi was Ten Thousand One Hundred Fifty-Five Dollars ($10,155.00).

102.    To date, no payments have been made to JLB or to subcontractors by ACS for the modifications to the Sunflower site.

*The UWF Hospital Site*

103.    The contract price from ACS to JLB for UWF Hospital in Pensacola, Florida[32] was Eighteen Thousand Five Hundred Dollars ($18,500.00).

104.    Piedmont[33], A & J Electric[34] and Ravonte[35], the subcontractors hired by JLB or hired by its subcontractors to perform work at the UWF Hospital site, were paid Ten Thousand Dollars ($10,000.00), Two Thousand Six Hundred Thirty Three Dollars and 33/100 ($2,633.33) and Eight Hundred Forty Three Dollars and 33/100 ($843.33), respectively, by ACS, for that site.

---

[30] Please refer to Article 5 of the Agreement for an explanation of procedure with regard to modifications.

[31] Also referenced in the Plaintiff's documents as "G580", Project #23211 and Purchase Order #54488.

[32] Also referenced in the Plaintiff's documents as Project #23061 and Purchase Order #54316.

[33] Piedmont is not a party to this action.

[34] A&J Electric is not a party to this action.

[35] Ravonte is not a party to this action.

105.   To date, ACS has paid Piedmont, A & J Electric and Ravonte Thirteen Thousand Four Hundred Seventy-Six Dollars and 66/100 ($13,476.66) for the UWF Hospital site.

## III.    The Factoring Agreement

106.   On information and belief, on or about December 12, 2003, Jason L. Bentley, on behalf of JLB, entered into an on-line factoring agreement with Capital Factors, Inc. ("CFI"), a lending corporation which later became a part of Capital, assigning a certain unascertained portion of JLB's accounts receivable due under the Agreement to Capital.

107.   On or about July 13, 2004, Capital began to demand payment from ACS for work performed under the Agreement, and instructed ACS not to forward any further payment to JLB.

108.   Pursuant to Article 4.1.9 of the Agreement, JLB was responsible for "promptly provid[ing] information to ATC that may affect the Contract Documents...".

109.   Pursuant to Article 6.3 of the Agreement, JLB "shall not subcontract, assign or transfer the Work, any Schedule, PO or this Agreement, or any portion thereof, without the prior written consent of ATC...".

110.   The Plaintiffs were neither given notice of, nor asked permission for, JLB's assignment of the accounts receivable under the Agreement.

## IV.    Liens

111.    On or about August 16, 2004, WCCS filed a notice of intent to lien and a notice of labor and materialman's lien for the Cleveland site and the Sunflower site.

112.    On or about March 24, 2004, JLB provided a Release of Claims related to the China Wok site.

113.    On or about March 24, 2004, JLB provided a Release of Claims related to the MLK site.

114.    In accordance with Article 4.7.4 of the Agreement, JLB waived its right, and the rights of any subcontractors with whom it contracted, to place any mechanics' liens or other liens on any of the Sites.

115.    JLB did not complete all of the work at a number of Sites as agreed in the original Scope of Work as defined for each site, thereby causing ACS to incur additional monies and expenses in order to complete the work.

## IV.    The Final Amounts Due and Owing

116.    To date, ACS has paid directly to JLB Forty-Six Thousand One Hundred Dollars ($46,100.00) in accordance with the Agreement.

117.    To date, ACS has paid directly to certain subcontractors One Hundred Sixteen Thousand Seven Hundred Sixty-Five Dollars and 96/100 ($116,765.96).

118.    To date, ACS has paid additional monies or incurred additional costs beyond the contract price for certain sites in the amount of Twenty-Two Thousand Seven Hundred Fifty Dollars ($22,750.00).

119.    Under the Agreement, ACS maintains that it now owes JLB a total of One

Hundred Twenty-Nine Thousand Nine Hundred Thirty-Nine Dollars and 04/100

($129,939.04) (the "Interpleader Amount") in full satisfaction of the Agreement.

The Interpleader Amount was calculated by the following analysis: Original

Contract Price, minus payments to Subcontractors paid directly by ACS, minus

payments made to JLB by ACS, minus additional monies paid by or costs

incurred by ACS for the completion of the various projects at the Sites.

120.    Based on the foregoing, it appears that JLB is responsible to ACS for the

payment and resolution of existing Subcontractor claims which total One

Hundred Eighty-Seven Thousand Seven Hundred Twenty-Two Dollars and

51/100 ($187,722.51).

121.    Capital is demanding payment on the accounts receivable from ACS

under the Agreement in the amount of One Hundred Sixty-Six Thousand Two

Hundred Eighty-Three Dollars ($166,283.00).

122.    On information and belief, no payments have been made to the

subcontractors by JLB or Capital.

## CLAIMS FOR RELIEF

### COUNT I
### (Breach of Contract)
### (American Tower Corporation v. J.L.B. Construction, Inc.)

123.    The Plaintiff incorporates by reference herein the allegations contained in

Paragraphs 1-122, as though fully set forth herein.

124.    On or about January 1, 2003, the Plaintiff and the Defendant JLB entered

into an Agreement whereby the Defendant JLB would provide general

contracting services for twenty-two (22) Sites leased by the Plaintiff or owned or leased by third-party customers of American Tower.

125.   The Defendant JLB breached the Agreement by failing to complete the general contracting services, failing to obtain the permission of the Plaintiff before assigning a portion of the Agreement to Capital, failing to give notice to the Plaintiff of a material change in the Agreement, failing to obtain lien waivers from all of the subcontractors and failing to pay all of the subcontractors.

126.   The Agreement (Article 4.7.3) states that JLB will reimburse American Tower for "all costs of collection, including but not limited to, reasonable attorneys' fees, collection fees and court costs incurred by [American Tower] to collect properly due payments, or payments due and owing to subcontractors....".

   **WHEREFORE**, the Plaintiff seeks judgment against the Defendant JLB for a sum to be determined at trial, plus interest, attorneys' fees and court costs.

## COUNT II
### (Fraud)
### (American Tower Corporation v. J.L.B. Construction, Inc.)

127.   The Plaintiff incorporates by reference herein the allegations contained in Paragraphs 1-126, as though fully set forth herein.

128.   By its words, signatures and conduct, the Defendant JLB materially misrepresented certain facts to the Plaintiff regarding its ability and wherewithal to complete the Site projects, thereby causing the Plaintiff to enter into the Agreement for the construction of the twenty-two (22) Sites.

129.   The Defendant JLB assigned portions of the Agreement for accounts receivable to Capital without notifying or obtaining the permission of the Plaintiff.

130.   Further, the Defendant JLB authorized work at a number of the Sites in an amount greater than the contract price for each site.

131.   The subcontractors performed work and the Defendant JLB has failed to pay the subcontractors for valid work.

132.   The Plaintiff reasonably relied on the representations of the Defendant JLB to its detriment.

**WHEREFORE,** the Plaintiff has suffered monetary damages as a result of the Defendant's fraudulent conduct and demands judgment against the Defendant in an amount to be proven at trial, plus interest and court costs.

### COUNT III
### (Indemnification)
### (American Tower Corporation v. J.L.B. Construction, Inc.)

133.   The Plaintiff incorporates by reference herein the allegations contained in Paragraphs 1-132, as though fully set forth herein.

134.   JLB is responsible to the Plaintiff for the payment and resolution of existing Subcontractor claims for valid work performed at all of the Sites in the amount of One Hundred Eighty-Seven Thousand Seven Hundred Twenty-Two Dollars and 51/100 ($187,722.51).

135.   The Plaintiff neither hired, nor approved, of any of the subcontractors hired to perform work at the Sites.

136.   The Plaintiff was never given notice of the additional charges, nor did it authorize the work to be performed, above and beyond the contract price for each site.

137.   JLB has neglected and refused to pay the amounts due to its

subcontractors.

138.   The Plaintiff has already directly paid One Hundred Sixteen Thousand

Seven Hundred Sixty-Five Dollars and 96/100 ($116,765.96) to certain

subcontractors.

139.   The Agreement (Article 4.7.3) states that:

> if [American Tower] has reason to believe that [JLB] is not
> timely paying its subcontractors, Contractor agrees that [JLB]
> shall have the right to make any payment due hereunder to
> Contractor jointly to Contractor and to any person, subcontractor,
> supplier or other entity to whom Contractor is indebted for labor
> performed or materials furnished in the performance of the Work.

140.   The Agreement states further in Article 4.6 that:

> [Contractor agrees], to the fullest extent permitted by law,
> to indemnify, defend and hold harmless the Project Site Owner,
> [American Tower's] Customer, [American Tower], its subsidiary
> and affiliated companies and their respective directors, officers,
> employees, agents and assigns from and against any and all
> claims, damages, losses, judgments, liens, demands, liabilities and
> expenses of every nature and kind, including but not limited
> to...reasonable attorneys' fees, expert witness fees and court costs
> arising out of, related to or resulting from a) Contractor's
> performance of the Work, b) the acts or omissions of Contractor [or]
> Contractor's subcontractors..., c) the breach of any of the
> provisions of this Agreement by Contractor, its subcontractors...., or
> d) any claim of infringement of any patent.

141.   On or about December 2, 2003, the Defendant JLB apparently entered

into a factoring agreement with Capital and is liable for any damages arising out

of any claims made by Capital.

142.   The Plaintiff never consented to any agreement with Capital.

143.    The Plaintiff was never given any notice, nor asked permission by the Defendant JLB, to enter into an agreement with Capital for the factoring of the accounts receivable under the Agreement.

144.    JLB has denied that there is an enforceable factoring agreement with Capital.

145.    In the event of recovery by any of the Defendants on any matter or claim arising from the Defendant JLB's breach of this Agreement or its assignment of the accounts receivable to Capital, the Plaintiff is entitled to full and complete indemnification from the Defendant JLB for damages, fees, costs and expenses related thereto.

    **WHEREFORE**, the Plaintiff demands judgment against the Defendant JLB for indemnification related to any and all damages awarded against the Plaintiff and any and all fees, costs and expenses incurred by the Plaintiff in defending same.

### COUNT IV
### (Contribution)
### (American Tower Corporation v. J.L.B. Construction, Inc.)

146.    The Plaintiff incorporates by reference herein the allegations contained in Paragraphs 1-145, as though fully set forth herein.

147.    The Defendant JLB hired the subcontractors to perform work at each of the Sites.

148.    At no time did the Plaintiff agree in writing to hire the subcontractors for work performed at the Sites, and at no time did the Plaintiff authorize the additional charges incurred above and beyond the contract price for each site.

149.   On or around December 2, 2003, the Defendant JLB entered into a

factoring agreement with Capital relating to the accounts receivable pursuant to

the Agreement and related work.

150.   At no time did the Plaintiff consent to the factoring agreement between the

Defendant JLB and the Defendant Capital.

151.   In the event that any Defendant recovers judgment against the Plaintiff,

the Plaintiff will be entitled to judgment against the Defendant JLB for contribution

toward damages and costs awarded said Defendant(s).

   **WHEREFORE**, the Plaintiff demands judgment against the Defendant JLB

for contribution relating to all damages and/or costs awarded against the Plaintiff.

### COUNT V
### (Interpleader)
### (American Tower Corporation v. All Defendants)

152.   The Plaintiff incorporates by reference herein the allegations contained in

Paragraphs 1-151, as though fully set forth herein.

153.   On or about January 1, 2003, the Plaintiff American Tower, on behalf of

ACS, and the Defendant JLB entered into a Master Contractor Agreement (the

"Agreement") whereby JLB agreed to provide general contracting services to

ACS and American Tower at twenty-two (22) Sites located in a number of states

across the United States.

154.   Pursuant to Article 4.7.1 of the Agreement, JLB was given the authority to

hire subcontractors in order to complete the work at each of the Sites in

exchange for payment by American Tower to JLB for all work completed.

155.    Under Article 9.1 of the Agreement, American Tower agreed to pay JLB for the completion of the Work at each of the Sites.

156.    American Tower reserved the right, under Article 4.7.2 of the Agreement, to make payments to a subcontractor directly in the event that JLB failed to pay any subcontractor as promised.

157.    On information and belief, on or about December 12, 2003, Jason L. Bentley, on behalf of JLB, entered into an on-line factoring agreement with Capital Factors, Inc. ("CFI"), a lending corporation which later became a part of Capital, assigning a certain unascertained portion of JLB's accounts receivable due under the Agreement with ATC to Capital.

158.    To date, ACS has paid Forty-Six Thousand One Hundred Dollars ($46,100.00) to JLB in accordance with the Agreement for such Sites.

159.    To date, ACS has paid certain subcontractors One Hundred Sixteen Thousand Seven Hundred Sixty-Five Dollars and 96/100 ($116,765.96).

160.    To date, ACS has paid additional monies and incurred additional costs beyond the contract price for certain sites in the amount of Twenty Two Thousand Seven Hundred Fifty Dollars ($22,750.00).

161.    Under the Agreement, ACS believes it now owes JLB a total of One Hundred Twenty-Nine Thousand Nine Hundred Thirty-Nine Dollars and 04/100 ($129,939.04) (the "Interpleader Amount") in full satisfaction of the Agreement.

162.    Based on the foregoing, JLB is responsible to Plaintiff for the payment and resolution of existing Subcontractor claims against JLB and the Plaintiff which

total One Hundred Eighty-Seven Thousand Seven Hundred Twenty-Two Dollars and 51/100 ($187,722.51).

163.    Capital is demanding payment on the accounts receivable from ACS under the Agreement in the amount of One Hundred Sixty-Six Thousand Two Hundred Eighty-Three Dollars ($166,283.00) and JLB is denying that Capital is entitled to payment of its accounts receivable.

164.    By reason of these conflicting claims, the Plaintiff is uncertain as to the amount, if any, of the remaining remuneration under the Agreement that is owed to each Defendant.

165.    As a result of the aforesaid conflicting claims and demands, the Plaintiff is potentially exposed to multiple liability.

166.  The Plaintiff is entitled to interpleader pursuant to Rule 22 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1335.

       **WHEREFORE**, the Plaintiff requests this Honorable Court enter an order: (i) allowing the Plaintiff to interplead the Interpleader Amount into the Registry of the Court; (ii) restraining each of the Defendants from instituting any action against the Plaintiff for the recovery of monies under the Agreement or for work performed on the Sites; (iii) that if the Court shall determine that Plaintiff owes any monies to any Defendants under the Agreement, requiring the Defendants to interplead and settle between themselves their rights to the Interpleader Amount; (iv) discharging the Plaintiff from all other liability to the Defendants, except to the Defendant(s) whom the Court shall adjudge are entitled to recovery of some

portion of the Interpleader Amount; and (v) granting such other and further relief as the Court may deem equitable and just under the circumstances.

## COUNT VI
### (Declaratory Relief)
### (American Tower Corporation v. All Defendants)

167.   The Plaintiff incorporates by reference herein the allegations contained within Paragraphs 1-166, as though fully set forth herein.

168.   An actual and serious controversy has arisen between the Plaintiff and the Defendants as to the following:

> (A)   Whether or not the Plaintiff owes any further monies under the Agreement to the Defendant JLB or to any other Defendants;

> (B)   Whether or not the Defendant JLB is in breach of the Agreement with regard to its hiring and failure to pay subcontractors;

> (C)   Whether or not the Defendant JLB is in breach of the Agreement with regard to agreeing to payments to the subcontractors over and above the contract price under the Agreement;

> (D)   Whether or not the subcontractors who filed liens are in breach of the Agreement; and

> (E)   Whether or not the Defendant JLB must indemnify Plaintiff for all damages, fees and costs.

169.   Unless these controversies are resolved shortly, the Plaintiff and the Plaintiff's third-party customers are likely to suffer immediate and irreparable harm by the further distribution of proceeds to any of the Defendants.

170.   The Plaintiff cannot settle the existing controversy without the aid of this Court's judgment.

WHEREFORE, the Plaintiff requests this Court to:

a.   Enter a declaratory judgment that the Defendant JLB, the Defendant Subcontractors and the Defendant Capital are not entitled to any further payments from the Plaintiff, other than a portion, if any, of the Interpleader Amount.

b.   Enter a declaratory judgment that the Plaintiff is discharged of any liability in excess of the Interpleader Amount.

c.   Enter a declaratory judgment that the Defendant JLB is solely responsible for all remaining payments in excess of the Interpleader Amount, if any, to the subcontractors under the Agreement due to JLB's conduct and failure to obtain consent of the Plaintiff.

d.   Enter a declaratory judgment that any and all liens filed by the Defendant Subcontractors are deemed invalid and discharged.

e.   Enter a declaratory judgment that the Defendant JLB must reimburse the Plaintiff for all attorneys' fees and court costs incurred and associated with this action.

f.   And grant such further relief as the Court may deem equitable and just under the circumstances.

THE PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES
SO TRIABLE.

Respectfully submitted,
AMERICAN TOWER
CORPORATION,
By its attorneys,


Gregory J. Aceto, Esq.
(BBO No. 558556)
JOHNSON & ACETO, P.C.
67 Batterymarch Street,
Suite 400
Boston, MA  02110
(617) 728-0888

Date: November 1, 2004

## AMERICAN TOWER CORPORATION

## MASTER CONTRACTOR AGREEMENT

This Master Contractor Agreement ("Agreement") made as of this __1__ day of __Jan.__, 20__03__, between American Tower Corporation and its subsidiary and affiliated companies (collectively "ATC"), a Delaware corporation with offices at 116 Huntington Avenue, Boston, MA  02116 and
__J.L.B. Construction Inc_____ and its subsidiary and affiliated companies, a/an __Iowa____ corporation, with offices at __241 West Franklin Street __Denver, Iowa 50622__
("Contractor") (ATC and Contractor may herein be referred to as "Party[ies]").

## RECITALS

WHEREAS, Contractor provides construction and equipment installation or other tower site services; and

WHEREAS, ATC may, either for itself or pursuant to a contract signed with an ATC Customer ("Prime Contract"), request that Contractor construct all
other tower site services.

NOW THEREFORE, in consideration of the mutual covenants benefiting the Parties hereto, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereto agree as follows:

### ARTICLE 1:  THE CONTRACT DOCUMENTS

1.1  The agreement between the Parties shall be evidenced by the completion and execution by both Parties of a schedule in the form of Schedule 1 attached hereto ("Schedule") or a Purchase Order ("PO") issued by ATC and accepted by Contractor. Such Schedule or PO shall describe the Work to be completed by Contractor at the project site or sites ("Project") and include the architectural and engineering drawings, scope of work and other specifications attached thereto (together with its relevant Schedule or PO, the "Work"). The terms and conditions of this Agreement shall apply to all Work pursuant to any such Schedule or PO. Any Project specific terms, including without limitation contract price ("Contract Price"), shall be set forth on the relevant Schedule or PO for such Project. Notwithstanding anything to the contrary herein, no Project or Work shall be authorized by ATC unless both ATC and Contractor have executed a completed Schedule or a PO has been issued and accepted with respect to such Project or Work. A Schedule or PO becomes binding subject to the terms set forth herein when accepted or acknowledged in writing by Contractor or upon commencement of performance by Contractor. No change in the Schedule or PO shall be valid unless such change is in writing and signed by an authorized representative of ATC.

1.2  ATC reserves the right to revise the form of the PO or Schedule.

1.3  The Contract Documents consist of (a) this Agreement, (b) the Schedule or PO, (c) all documents listed in a Schedule or PO, and (d) modifications to each Schedule or PO ("Modifications"). These Contract Documents are incorporated herein by reference in their entirety and are as fully a part of this Agreement as if attached to this Agreement or repeated herein. This Agreement represents the entire and integrated agreement between the Parties hereto and supercedes prior communications and agreements, whether written or oral, concerning the subject matter of the Contract Documents. Any different, conflicting or additional terms contained in Contractor's acceptance or acknowledgement are hereby expressly rejected by ATC and shall have no effect. The Contract Documents specific to each Project, other than Modifications to each respective Schedule or PO issued subsequent to the execution of such Schedule or PO, are listed in the Schedule or PO. No change or Modification shall be valid unless agreed to in writing and signed by an authorized representative of ATC.

1.4  The specifications and drawings provided to Contractor by ATC may not be complete in every detail. Contractor shall comply with the manifest intent and general purpose, taken as a whole. If Contractor identifies

or becomes aware of any conflict, error or omission in the drawings, specifications, instructions or in work done by others, Contractor shall notify ATC at once and ATC will issue written instructions to Contractor. If Contractor proceeds with any Work prior to receiving such instructions, all corrections or re-work shall be performed at Contractor's expense.

## ARTICLE 2: TERM

2.1 The term of this Agreement ("Term") shall commence on the date first written above (the "Effective Date") and, unless terminated in accordance with Article 7, shall continue for a two-year period following the Effective Date and shall remain in effect, with respect to each Schedule or PO, for so long thereafter as any Work described in such Schedule or PO remains uncompleted. Notwithstanding the foregoing, the Term of this Agreement shall automatically renew in accordance with the terms and conditions herein for successive periods of two (2) years each at the end of each then-current Term unless either party shall have given the other no less than ninety (90) days prior written notice of its intention to terminate this Agreement effective as of the end of the then-current Term.

## ARTICLE 3: ATC'S RIGHTS AND RESPONSIBILITIES

3.1 ATC shall promptly notify Contractor of any circumstances known to the ATC Project Manager that materially affect the Work.

3.2 Liquidated damages for delay, as provided for in the relevant Schedule or PO, shall be assessed against Contractor to the extent that such damages or delays are caused by Contractor, Contractor's employees and agents, subcontractors, suppliers or any person or entity for whose acts or omissions Contractor may be liable.

## ARTICLE 4: CONTRACTOR'S RIGHTS AND RESPONSIBILITIES

### 4.1 Execution and Progress of the Work

4.1.1    All Work shall be performed ir
care exercised by reputable coi
the Project and using the Contr
for all construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under this Agreement. The Contractor shall be responsible to ATC for the acts and omissions of the Contractor's employees, its subcontractors and their agents and employees, and other persons performing the Work on behalf of Contractor; Contractor shall use methods, equipment and documentation practices which conform with prevailing standards of accuracy, competence and completeness for the Work required and in accordance with all applicable regulations and agency requirements of the state in which the Work is performed, or as otherwise specified by ATC.

4.1.2    Unless otherwise specified in a Schedule or a PO, Contractor shall, at its own expense, furnish all labor, materials, tools, machinery, vehicles, transportation, subcontracted items, supplies, equipment, personnel and facilities necessary to complete the Work. All of the Work shall be performed in accordance with the Contract Documents.

4.1.3    Contractor shall supply ATC with its schedule and shall cooperate with ATC in scheduling and performing Contractor's Work to avoid conflict, delay or interference with the work of other contractors.

4.1.4    Contractor shall promptly submit shop drawings, product data, samples and similar submittals required by the relevant Contract Documents, and in such sequence as to avoid causing a delay in the Work or in the activities of other contractors.

4.1.5    Contractor shall furnish to ATC periodic progress reports on the Work on each respective Schedule or PO as mutually agreed upon or upon ATC's reasonable request. The periodic progress reports shall include information on the status of materials and equipment that may be in the course of preparation or manufacture.

4.1.6    Contractor agrees that ATC shall have the authority, in its sole discretion, to reject Work that does not conform to the Contract Documents.

4.1.7    Contractor shall take necessary precautions to protect the work of other contractors.

4.1.8    Contractor shall cooperate with other contractors and with ATC during performance of the Work.

4.1.9    Contractor shall promptly provide information to ATC that may affect the Contract Documents, each respective Schedule or PO, or the Work and that becomes available to Contractor subsequent to execution of this Agreement.

**4.2  Laws, Permits, Fees and Notices**

4.2.1    Contractor shall give all notices and comply with all laws, ordinances, rules, regulations and orders of public authorities applicable to the performance of the Work, including without limitation, all federal, state and local safety regulations and Occupational Safety and Health Act ("OSHA") requirements. Where any rules, regulations and practices are in conflict, Contractor shall comply with the provision that is the most stringent.

4.2.2    Contractor shall secure and pay for all permits and governmental fees, licenses and inspections necessary for proper execution and completion of Contractor's Work, provided that upon in ATC's sole discretion, ATC may issue checks payable directly to the appropriate governmental entity for the cost of any such permit, license or fee.

4.2.3    Contractor warrants that it, and that any subcontractor that Contractor may hire, has all current and valid licenses required by state and local laws for contractors doing the type of Work covered by the relevant Contract Documents and agrees to supply copies of those licenses to ATC upon request.

4.2.4    Contractor shall pay all federal, state and local taxes related to the Work and shall comply with social security acts, unemployment compensation acts, and workers compensation acts applicable to the Work. Prior to the commencement of any Work to be performed in the state of North Carolina, Contractor must, and Contractor must cause every subcontractor retained by Contractor to, deliver to ATC a certificate from the North Carolina Industrial Commission stating that Contractor and its subcontractors have each complied with G.S. 97-93 of the North Carolina General Statutes.

**4.3    Safety Precautions and Procedures**

4.3.1    Contractor shall take all necessary or required safety precautions with respect to the performance of the Work and shall comply with all applicable laws, ordinances, rules, regulations and orders of public authorities for the safety of persons or property, including without limitation the requirements of OSHA and other governmental authorities and agencies. Contractor shall provide all necessary or required protection, including without limitation the provision of employee training and appropriate fall protection equipment, to prevent damage, injury or loss to: (a) all persons performing the Work and all other persons who may be affected thereby; (b) the Work, and all materials and equipment to be incorporated therein, whether in storage on or off the Work Site, under the care, custody or control of Contractor or any of its subcontractors, and (c) all other property at the Work Site or adjacent thereto, including substructures. Contractor shall report any injury or death immediately to ATC. Contractor shall also immediately notify its insurance carrier of any such injury or death and shall provide a copy of any investigation, report or notification to ATC.

4.3.2    Contractor shall conduct a safety meeting each day prior to the commencement of Work. Such safety meeting shall address, at a minimum, the Work planned for the day, safety equipment and procedures, and coordination with other contractors. Contractor shall prepare a daily safety meeting agenda sheet that shall be signed by Contractor's employees and maintained in the Contractor Project file.

4.3.3   Contractor shall, prior to using any hazardous substance, give written notice of the chemical composition thereof to its employees and subcontractors and to ATC.

4.3.4   In the event Contractor encounters material on the Site reasonably believed to be a hazardous substance, asbestos or polychlorinated biphenyls ("PCB"), Contractor shall immediately stop Work and report the condition to ATC in writing. The Work in the affected area shall not resume until the condition has abated or has been adequately addressed.

4.3.5   Notwithstanding anything to the contrary herein, in the event that ATC observes any violation by Contractor, or Contractor's subcontractors, of their safe work practices obligations under this Article 4, ATC may order the Work stopped until the violation is corrected and Contractor shall receive no additional compensation and no extension of the completion date for the Work on account of such Work stoppage. If the violation is not corrected within a reasonable period of time after Work is stopped, ATC may, in its sole discretion, declare Contractor to be in default of this Agreement.

4.3.6   Contractor shall provide, and its employees shall use, approved safety and health equipment. Contractor shall work in harmony with other workers at the construction site, and shall be responsible for compliance with all safety rules and regulations under OSHA and other applicable statutes and ordinances related to the Work. Contractor shall indemnify, defend and hold harmless ATC and its subsidiary and affiliated companies and their respective directors, officers, employees, agents and assigns from and against any claims, liability, expenses or obligations of every nature and kind, including fines, penalties, counsel fees, expert and other fees and expenses and costs of litigation, defense settlement or judgments, arising out of or related to Contractor's safety and health practices.

4.3.7   Contractor shall provide all safety and health information reasonably requested by ATC's health and safety staff during the Term of this Agreement.

### 4.4   Cleaning up

Contractor shall keep the Project site and surrounding area free from accumulation of debris, waste materials or rubbish caused by the Work.

### 4.5   Warranty

4.5.1   Contractor warrants to ATC that materials and equipment furnished under the Contract Documents will be of good quality and new unless otherwise required or permitted by the Contract Documents, that the Work will be free from defects, and that the Work will conform, in all respects, with the requirements of the Contract Documents. Contractor hereby further warrants that it will deliver to ATC good and marketable title to the equipment and materials furnished by Contractor hereunder, if any, free and clear of all encumbrances whatsoever, and that Contractor shall assign to ATC all manufacturer's warranties regarding such equipment and materials. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. The decision of ATC, or its authorized representative, shall be final as to the quality of workmanship and materials, and any Work rejected shall be promptly repaired or replaced by Contractor at its sole expense. This warranty shall be in addition to, and not in limitation of, any other warranty or remedy provided by law or by the Contract Documents. For a period of one (1) year after the date on which the Work has been accepted by ATC, or such longer period as may be required by ATC's Specifications, Contractor warrants the Work against defective materials (supplied by Contractor) and faulty workmanship, and warrants the proper operation of the Work under normal conditions. Contractor further warrants that the Work site will be as fully restored, to the extent possible, to its state existing prior to commencement of the Work or the required restoration of the Work site discovered by ATC within the warranty period, and Contractor, at its sole expense, shall promptly repair or restore the same. Final payment or acceptance of the Work by ATC shall not relieve Contractor from any of its warranty obligations.

4.5.2   Contractor warrants that all Work shall be performed by qualified persons or contractors, including, but not limited to, steeplejacks or other tower climbers. In the event that the Work includes the erection of the

tower structure, ATC and Contractor agree that Contractor shall have sole responsibility for the conduct of the activities relating to the erection of the tower structure and that ATC may and shall rely solely upon Contractor's judgment and expertise in conducting appropriate control and safety procedures with respect to such Work.

**4.6   Indemnification**

4.6.1   It is agreed that five percent (5%) of the Contract Price (and not in addition to such amount) is allocated to and paid in consideration for Contractor's agreement, to the fullest extent permitted by law, to indemnify, defend and hold harmless the Project Site Owner, ATC's Customer, ATC, its subsidiary and affiliated companies and their respective directors, officers, employees, agents and assigns from and against any and all claims, damages, losses, judgments, liens, demands, liabilities and expenses of every nature and kind, including without limitation, claims for personal injury or death (including injury or death to Contractor's employees), property damage, adverse effects on the environment and reasonable attorneys' fees, expert witness fees and court costs, arising out of, related to or resulting from (a) Contractor's performance of the Work, (b) the acts or omissions of Contractor, Contractor's subcontractors, or anyone directly or indirectly employed by them or any party for whose acts or omissions they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder, (c) the breach of any of the provisions of this Agreement by Contractor, its subcontractors, or anyone directly or indirectly employed by them or anyone for whose acts or omissions Contractor may be liable or (d) any claim of infringement of any patent, trademark or other intellectual property right. Such indemnity obligations shall be in addition to any other rights available to any Party indemnified hereunder, and shall not be limited in any manner by the provisions of applicable worker's compensation statutes.

4.6.2   Contractor shall be given notice of the institution of any suit, claim or demand within a reasonable time after an officer of ATC acquires actual knowledge thereof, and shall defend the same with counsel satisfactory to ATC and without cost to ATC (saving that ATC shall pay its own counsel fee if it wishes to have separate representatives in any such suit). ATC will cooperate with Contractor and give reasonable access to information. Contractor shall reimburse ATC for expenses incurred by ATC in giving such information and cooperation. No compromise or settlement of any such suit, claim or demand shall be entered into without the prior written consent of ATC.

**4.7      Subcontractors**

4.7.1   Subject to Section 6.3, Contractor may enter into agreements with subcontractors to perform portions of the Work. Contractor shall bind all subcontractors to the terms and conditions of this Agreement and the relevant Contract Documents, and Contractor agrees that Contractor is as fully responsible to ATC for the acts or omissions of its subcontractors and of persons directly or indirectly employed by them as it is for its own acts and omissions. Notwithstanding anything to the contrary in this Agreement or any of the Contract Documents, ATC reserves the right, in its sole discretion, to refuse to permit any company, person or other entity to perform the Work.

4.7.2   If ATC has reason to believe that Contractor is not timely paying its subcontractors, Contractor agrees that ATC shall have the right to make any payment due Contractor hereunder jointly to Contractor and to any person, subcontractor, supplier or other entity to whom Contractor is indebted for labor performed or materials furnished in the performance of the Work. Contractor agrees to pay ATC all costs of collection, including but not limited to, reasonable attorneys' fees, collection fees and court costs incurred by ATC to collect properly due payments, or payments due and owing to subcontractors, excluding costs associated with invoices disputed in good faith.

4.7.3   If ATC's charges or invoices to Contractor fall due or if Contractor owes money or is otherwise obligated to make payments to ATC when invoices rendered by Contractor become payable, ATC may offset its invoices or the sums due or obligated, making remittance to Contractor only for any balance due. Where the balance is in ATC's favor, ATC shall so advise Contractor and Contractor shall remit to ATC the balance due. This offsetting of invoices or sums due or obligated shall not affect the right of either party to question the correctness of the invoices.

4.7.4   To the extent permitted under the laws of the state in which the Work is located, Contractor hereby agrees to waive and does hereby waive any and all mechanics' liens and right to lien in connection with the Work, agrees not to file any such mechanics' lien and agrees to look solely to ATC for payment for services hereunder and not to the Work Site. Contractor hereby agrees to include similar waiver provisions in each and every Subcontract by which each Subcontractor, to the extent permitted under the laws of the state in which the Work is located, waives any and all mechanics' liens and right to lien in connection with the Work.

**4.8   Inspections and Tests**

4.8.1   ATC and its agents, employees and representatives shall have access to the Work or Project Site, and Contractor shall provide proper facilities for such access and for inspection.

4.8.2   ATC shall have the right to reject defective materials or workmanship and to require correction of such defects. Defective workmanship rejected by ATC shall be corrected to the reasonable satisfaction of ATC, and rejected materials shall be immediately removed from the Project Site without charge to ATC. If Contractor does not correct such defective workmanship within a reasonable time, or remove rejected materials immediately, ATC may correct such defective workmanship or remove such rejected materials and charge Contractor for all costs associated therewith, including, but not limited to, reasonable attorneys' fees. ATC, at any time before final acceptance of the entire Work, may make an examination of any items of Work already completed, and Contractor shall, upon request, promptly furnish all necessary facilities, labor and materials therefore. If such items of Work are found to be defective, Contractor shall pay for such examination, any demolition and any reconstruction.

4.8.3   Contractor shall not be relieved of its warranty obligations regardless of whether or not ATC inspects the Work.

## ARTICLE 5:  MODIFICATIONS TO THE WORK

5.1   ATC may order changes to the Work within the general scope of the Contract Documents by issuing Modifications to the applicable Schedule or PO, and shall promptly deliver a copy of such Modification to Contractor. Such Modifications shall be performed by Contractor without adjustment to the Contract Price or time to perform. Unless otherwise directed by ATC, Contractor shall not thereafter order materials or perform Work that would be inconsistent with such Modifications.

5.2   ATC may order Contractor to make Modifications, consisting of additions, deletions or other revisions outside the general scope of the Contract Documents, and the Contract Price and time to perform shall be equitably adjusted by ATC.

## ARTICLE 6:  TERMINATION, REMEDIES, OR ASSIGNMENT OF THIS AGREEMENT

**6.1   Contractor's Termination Rights and Remedies**

If ATC does not pay Contractor, through no fault of Contractor, within seven (7) days from the time payment should be made as provided in the relevant Schedule or PO, Contractor may, without prejudice to other available remedies, upon seven (7) additional days written notice to ATC, stop the Work until payment of all undisputed amounts due Contractor have been paid.

**6.2   ATC's Termination Rights and Remedies**

If Contractor (a) defaults or neglects to carry out the Work in accordance with any relevant Schedule, PO or the Contract Documents, (b) fails to abide by or perform any of the terms and conditions of any of the Contract Documents, (c) fails to make payment when due to subcontractors or suppliers, or (d) files for bankruptcy protection, whether voluntarily or involuntarily, or makes an assignment for the benefit of creditors, or can no longer pay its debts as they become due, and fails within three (3) business days after receipt of written notice from ATC to

correct such default, ATC may, without prejudice to any other remedy ATC may have, take any or all of the following actions:

    A.    Withhold payment of the Contract Price;

    B.    Remedy such defaults, including payment of any claims, liens or stop notices, or other sums required to be paid by Contractor by the relevant Contract Documents, and deduct the cost thereof from any payment due to Contractor by ATC; and/or

    C.    Terminate this Agreement, or the relevant Schedule or PO, and take possession of the Work site(s) and all materials, tools, and equipment at the Site and complete the Work in whatever way it deems expedient. If the unpaid balance of the Contract Price(s) exceeds the expense of finishing Contractor's Work, such excess (less ATC's reasonable internal costs or expenses for coordinating the completion of the Work) shall be paid to Contractor, but if such expense exceeds such unpaid balance, Contractor shall pay the difference to ATC or, in ATC's sole discretion, ATC may deduct the cost thereof from any payment due by ATC to Contractor.

**6.3  Assignment of this Agreement**

Contractor shall not subcontract, assign or transfer the Work, any Schedule, PO or this Agreement, or any portion thereof, without the prior written consent of ATC which shall not be unreasonably withheld. ATC may freely assign this Agreement or any Schedule or PO to a third party without the prior or subsequent approval of Contractor.

## ARTICLE 7:  THE WORK OF THIS AGREEMENT

7.1  Contractor shall execute the Work described in the applicable Schedule or PO and all Contract Documents, including all labor, materials, equipment, services and other items required to complete such Work. If applicable, Contractor acknowledges that it has received the relevant flow-down provisions of the Prime Contract between ATC and its Customer and agrees to be bound by all the terms and conditions of the Prime Contract insofar as each and every part thereof is applicable to this Agreement and to Contractor's Work. Contractor expressly assumes all obligations and responsibilities applicable to ATC under the Prime Contract and agrees that, in addition to any other rights and remedies afforded to ATC by this Agreement or law, ATC shall have the same rights and remedies against Contractor with respect to Contractor's Work that ATC's Customer has against ATC under the Prime Contract, all with the same force and effect as if set forth herein in full.

7.2  Contractor has carefully and thoroughly examined the Project, the nature and location of the Work, the local conditions, including those related to availability of transportation, disposal, handling and storage of materials, availability of labor, water, electric power, roads, and uncertainties of weather, or similar physical conditions at the Site, the conformation and conditions of the ground, the character of equipment and facilities needed preliminary to and during the prosecution of the Work, the difficulties of making and maintaining any required excavations, and all other matters required to perform the Work. Contractor has satisfied itself as to the character, quality, and quantities of Work to be performed, materials to be furnished, and as to the requirements of this Agreement. Contractor has used its own judgment obtaining and interpreting any necessary investigations or tests of the Site. By signing this Agreement, Contractor certifies that it has made such examination and is satisfied as to the conditions to be encountered in performing the Work, and as to the requirements of this Agreement.

## ARTICLE 8:  DATE OF COMMENCEMENT AND COMPLETION

8.1  Contractor's date of commencement shall be the date defined in the applicable Schedule or PO, unless a provision is made in such Schedule or PO for the date to be fixed in a notice to proceed issued by ATC.

8.2  The Work shall be completed, subject to adjustment of the Contract Time as provided in the Contract Documents, not later than the date defined as the completion date in the applicable Schedule or PO.

8.3 Time is of the essence of this Agreement.

8.4 No extension of time will be authorized without ATC's prior written consent.

### ARTICLE 9: CONTRACT PRICE & PAYMENT

9.1 Unless otherwise specified in the Schedule or PO, ATC shall pay Contractor the Contract Price in current funds for performance of the Work as defined in the applicable Schedule or PO, subject to additions and deletions as provided in the Contract Documents and payable as follows:

9.1.1 Eighty-five (85%) of the Contract price shall be paid upon satisfaction of all of the following: (a) completion of the relevant Work, (b) inspection and approval by ATC's representative of the relevant Work, (c) acceptance of the relevant Work by ATC, (d) receipt by ATC of Contractor's invoice for the relevant Work, (e) receipt by ATC of all required releases, waivers of liens and other documents listed in the Contract Documents, and (e) no claims, stop notices or liens arising out of the relevant Work have been made or remain in effect; and

9.1.2 The final payment defined in the relevant Schedule or PO, which shall represent fifteen percent (15%) of the relevant Contract Price, shall be paid to Contractor upon satisfaction of all of the following, which shall be deemed conditions precedent to ATC's obligation to make final payment: (a) Contractor shall have executed and furnished ATC with a release and waiver of all liens and all claims against ATC and ATC's Customer for labor performed thereon or materials incorporated therein; (b) Contractor shall have furnished ATC with a release and waiver of all liens and all rights to claim or file liens for labor performed thereon or materials incorporated therein, properly executed by any and all of Contractor's subcontractors, material men, vendors or others who furnished labor or materials; (c) Contractor shall furnish evidence satisfactory to ATC that all such third parties have been paid in full, and (d) Contractor shall provide ATC with as-built drawings, certificates of occupancy and a completed punch list that has been accepted by ATC.

9.2 Unless otherwise specified in the Schedule or PO, all payments to be made to Contractor pursuant to this Article 9 shall be paid by ATC within forty-five (45) days following the satisfaction of all of the conditions precedent described above, provided, however, that, notwithstanding anything to the contrary, in the event that ATC disputes the amount invoiced to it by Contractor, ATC shall not be required to make any payments to Contractor for disputed amounts until such dispute is resolved.

9.3 The Contract Price and all specified pricing, including all Modifications to the applicable Schedule or PO, is understood by Contractor to include, without limitation, all sales taxes, use taxes, excise taxes, transportation taxes, unemployment compensation taxes, old age benefits and social security taxes, and Contractor agrees to pay all of the above and to conform to all local, state and federal laws in connection with the filing and payment of such taxes.

### ARTICLE 10: DELAY

If Contractor is unavoidably delayed in performance hereunder by acts of God, public enemy, governmental authority, strikes or other events over which Contractor has no control, the completion date of the affected Work shall be reasonably extended by ATC, provided Contractor shall promptly notify ATC and shall take prompt action to minimize such delay; however, in no event shall Contractor receive any additional compensation because of such delay. The foregoing is intended to exclude delays arising solely from weather conditions and it is expressly agreed that delays caused for this reason are to be anticipated by Contractor after considering prevailing weather and seasonal patterns or other information concerning the geographical area of the Work, and any costs or delays associated with weather conditions have been previously considered in the pricing and completion date represented on the relevant Schedule or PO.

### ARTICLE 11: INSURANCE AND BONDS

11.1.1 Contractor shall, at its sole cost, purchase and maintain in full force during the Term of this Agreement the following insurance coverage, with limits of liability not less than those set forth below:

(a)   General Liability (Comprehensive Form)
Including products/completed operations, contractual liability, broad form property damage and independent contractor's coverage.

    1.   Bodily Injury, each occurrence..........................................................$1,000,000
    2.   Property Damage (including explosion,
       Collapse and underground damage)
       Each occurrence ...............................................................................$1,000,000
       Annual Aggregate.............................................................................$2,000,000

       Or

    3.   Bodily Injury and Property Damage Combined:
       Each Occurrence ..............................................................................$1,000,000
       Annual Aggregate.............................................................................$2,000,000

(b)   Automobile Liability (Comprehensive Form)

    1.   Bodily Injury,
       Each person......................................................................................$1,000,000
       Each occurrence ...............................................................................$1,000,000

       And

    2.   Property Damage
       Each oc

       Or

    3.   Bodily Injury and property Damage Combined:
       Each Occurrence ..............................................................................$1,000,000
       Annual Aggregate.............................................................................$1,000,000

(c)   Umbrella Policy ..........................................................................................$5,000,000

(d)   Worker's Compensation..............................................................................Statutory
(including Longshoremen and Harbor Workers Act and the Jones Act coverages if applicable)

(e)   Employer's Liability ....................................................................................$500,000

(f)   Professional Liability/Errors and Omissions (if applicable) ......................$1,000,000     For
Engineering and Geotechnical Services

11.1.2   Coverage shall be written on an occurrence basis and shall be maintained without interruption from the date of commencement of any Work until at least the date of final payment under this Agreement.

11.1.3   Prior to commencement of any Work, Contractor must deliver to ATC a valid certificate of insurance naming "American Tower Corporation and its subsidiary and affiliated companies" as additional insureds on all policies except Workers Compensation and Professional Liability, and shall contain a severability of interest provision and remove the cross liability exclusion. If required by ATC, Contractor agrees to name Project Site Owner and/or ATC's Customer as additional insureds. Contractor hereby represents that all subcontractors hired by Contractor to perform any portion of the Work shall maintain the same coverage, limits and endorsements as provided herein. These certificates, and the insurance policies required by this Article 11, shall contain a provision that coverage afforded under the policies will not be cancelled or allowed to expire until at least thirty (30) days prior written notice has been given to ATC. The

products/completed operations liability coverage shall be maintained in full force and effect for not less than three (3) years following completion of Contractor's Work.

11.1.4    All policies shall provide waivers of subrogation rights as against "American Tower Corporation and its subsidiary and affiliated companies" by endorsement or otherwise. If required by ATC, Contractor agrees to waive subrogation rights as against Project Site Owner and/or ATC's Customer. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

11.1.5    Subcontractor's compliance with this Article shall not constitute a limitation of liability or in any way limit or affect Contractor's indemnification obligations under this Agreement. The foregoing insurance coverage shall be primary and non-contributing with respect to any other insurance or self-insurance that may be maintained by the Project Site Owner, ATC's Customer or ATC.

11.1.6    Notwithstanding the foregoing insurance requirements, the insolvency, bankruptcy or failure of any insurance company providing insurance to Contractor, or failure of any such insurance company to pay claims accruing, shall not reduce or eliminate Contractor's obligations under this Agreement.

11.1.7    Contractor may be required to provide a Performance Bond and Payment Bond as described in the applicable Schedule or PO. Contractor shall promptly, upon request of ATC, furnish a copy, or permit a copy to be made, of any bond covering payment of obligations arising under this Agreement.

## ARTICLE 12:  MISCELLANEOUS PROVISIONS

12.1.1    This Agreement, and the interpretation, performance and enforcement hereof, shall be governed by the laws of the state in which the real property that is the subject of the Work in controversy is located. In the event that the controversy involves one or more Project sites, the interpretation, performance and enforcement hereof, shall be governed by the laws of the Commonwealth of Massachusetts without regard to its conflicts of laws provisions.

12.1.2    It is expressly understood and agreed that Contractor is an independent contractor and ATC shall not be liable for any Contractor errors or omissions in the performance of the Work and at no time are Contractor, its employees, agents, or subcontractors authorized to act as agents, partners, co-venturers, servants or employees of ATC.

12.1.3    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

12.1.4    If any term or provision of this Agreement is adjudged to be invalid or unenforceable, such invalidity or unenforceability shall not affect any of the terms or provisions of this Agreement, and all other terms and provisions not so adjudged shall remain in full force and effect.

12.1.5    No waiver of any of the provisions of this Agreement or any Schedule or PO shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless expressly agreed to in writing by the affected party.

12.1.6    Contractor agrees that the information contained in the Contract Documents, the Drawings, Project Site Specifications, Specifications, ATC Customer information, and all other documents relating to the Work, including revisions and associated information, are proprietary and confidential ("Confidential Information"). Contractor agrees to use the Confidential Information only for the purpose of this Agreement. The Confidential Information is not to be reproduced in any form except as required to accomplish the intent of this Agreement. Contractor must provide the same care to avoid disclosure or unauthorized use of the Confidential Inform information.

12.1.7   Contractor agrees not to publish or release to the press any information that identifies ATC's Customer or ATC or implies the name of ATC's Customer or ATC without the prior written consent of ATC.

12.1.8   During the Term of this Agreement, and for a period of one (1) year thereafter, Contractor shall not solicit or hire, directly or indirectly, ATC employees.

12.1.9   The provisions of this Agreement which by their nature are intended to survive the termination, cancellation, completion or expiration of this Agreement, including but not limited to any expressed limitations of or releases from liability, indemnifications and warranties shall continue as valid and enforceable obligations of the Parties notwithstanding any such termination, cancellation, completion or expiration.

12.1.10  The Parties acknowledge and agree that terms and conditions of this Agreement have been freely and fairly negotiated. Each Party acknowledges that in executing this Agreement they have relied solely on their own judgment, belief and knowledge and such advice as they may have received from their own counsel. No provision in this Agreement is to be interpreted for or against any Party because that Party or its legal counsel drafted such provision. This Agreement is intended by the Parties as the final, complete and exclusive expression of the terms and conditions of their agreement. No prior dealings between the Parties and no usage of the trade shall be relevant to supplement this Agreement, and this Agreement shall supersede all other written and/or oral agreements between ATC and Contractor. Unless otherwise agreed to in writing by ATC, any terms or qualifications contained in any documentation generated by Contractor in connection with this Agreement that are different, conflicting or additional with the terms hereof are hereby rejected, and shall be void and of no effect.

This Agreement entered into as of the day and year first written above except that this Agreement shall not become effective as to either party until executed by both parties.

**ATC**
American Power Corporation and its subsidiary and affiliated companies

By: _____

Name: _Sharon Bracken_____

Title: ___**Sharon Bracken**_____

     **Contractor Development Manager**

**CONTRACTOR**

By: _____

Name: _Jason Bentley_____

Title: _President_____

**Addendum to Master Contractors Agreement or Site Access Agreement**

This Addendum ("Addendum") is entered into as of __January 28_____, 2004__ by and between American Towers, Inc., a Delaware corporation ("ATC"), and JLB Construction Inc., a Iowa Corporation _____ ("Contractor").

WITNESSETH:

WHEREAS, ATC and Contractor entered into either that certain Master Contractor Agreement or Site Access Agreement dated as of __January 28, 2004_____ (the "Agreement"); and

1/1/03

WHEREAS, ATC and Contractor wish to promote increased safety in the tower industry with a goal towards reducing serious injury and deaths; and

WHEREAS, ATC and Contractor wish certain individuals to participate in training to help ensure that tower climbers have basic skills and competence in safe tower climbing methods and equipment related thereto; and

WHEREAS, ATC and Contractor wish to memorialize new terms and conditions covering all employees, agents, contractors or subcontractors of Contractor who will climb six (6) feet and above on ATC-owned or –managed towers or while working on any job for which ATC is either a contractor or subcontractor;

NOW, THEREFORE, in consideration of the foregoing and for other consideration, the receipt and sufficiency of which are hereby acknowledged, ATC and Contractor agree that the following terms shall apply to the Agreement:

1.    Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

2.    Training Requirement. Effective March 1, 2004, all employees, agents, contractors or subcontractors of Contractor who need to climb six (6) feet or higher on an ATC-owned or –managed tower or while working on any job for which ATC is either a contractor or subcontractor must have received training from an ATC-Approved Competent Tower Climber Organization. ATC only recognizes training provided by a Bechtel-Approved Competent Training Organization, a list of which can be obtained by Contractor from ATC.

3.    Demonstration of Compliance. Effective March 1, 2004, each tower climber must have in their possession a wallet card or other documentation indicating that they have received the appropriate Competent Tower Climber Training. Individuals without such documentation shall be removed from ATC-owned or –managed tower sites or from jobsites for which ATC is either a contractor or subcontractor. ATC shall not be liable for any costs, fees or expenses incurred by Contractor, or by Contractor's contractors or subcontractors, as a result of any such removal.

4.    ATC and Contractor agree that all other terms and conditions of the Agreement, not otherwise inconsistent with this Addendum, shall remain in full force and effect by and between the parties.

IN WITNESS WHEREOF, the parties hereunto have executed this Addendum as of the date first written above.

American Towers, Inc.                         Contractor

By: _____                   By: _____

Name: _____                    Name: _____ Jason Bentley _____