# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**CIVIL ACTION NO.: 05-12317**

AMERICAN TOWER CORPORATION,
                            Plaintiff,

v.

J.L.B. CONSTRUCTION, INC., 21ST
CAPITAL CORPORATION, PRIME
COMMUNICATIONS, LLC, AMF
ELECTRICAL CONTRACTORS, INC.,
HEINZ CORPORATION, DANIEL
WENESS CONSTRUCTION,
WESTERN STATES TOWER, LLC,
WEST CENTRAL CONSULTING
SERVICES, INC., STEWART
ELECTRIC, INC., GLOBAL TOWER
SERVICE, ADVANCED LIGHTNING
TECHNOLOGY, LTD. and GULF
COAST STEEPLEJACK,
                            Defendants.

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

## INTRODUCTORY STATEMENT

This is a civil action for (i) interpleader brought pursuant to Rule 22 of the Federal

Rules of Civil Procedure and 28 U.S.C. § 1335; (ii) breach of contract; (iii) fraud; (iv)

indemnification and contribution; and (v) declaratory relief, arising from a Master

Contractor Agreement, entered into on or about January 1, 2003, related to various

tower construction projects at twenty-three (23) tower sites located throughout the

United States, which were leased by the Plaintiff American Tower Corporation or owned

or leased by a third-party customer of the Plaintiff.

## PARTIES

1.     The Plaintiff American Tower Corporation (the "Plaintiff" or "American Tower") is a corporation incorporated under the laws of the State of Delaware having its principal place of business at 116 Huntington Avenue, Boston, Massachusetts 02116.

2.     The Defendant J.L.B. Construction, Inc. ("JLB" or the "Contractor") is a corporation incorporated under the laws of the State of Iowa having its principal place of business at 1030 Donna Street, Denver, Iowa 50622, with a former address of 241 West Franklin Street, Denver, Iowa 50622.

3.     The Defendant 21st Capital Corporation ("Capital") is a corporation incorporated under the laws of the State of California having its principal place of business at 23852 Pacific Coast Highway, #600, Malibu, California 90265.

4.     The Defendant Prime Communications, LLC ("Prime") is a corporation incorporated under the laws of the State of Missouri having its principal place of business located at 6716 Graden Road, Parkville, Missouri 64152.

5.     The Defendant AMF Electrical Contractors, Inc. ("AMF") is a corporation incorporated under the laws of the State of Missouri having its principal place of business located at 1627 Sublette Avenue, St. Louis, Missouri 63110.

6.     The Defendant Heinz Corporation ("Heinz") is a corporation incorporated under the laws of the State of Missouri having its principal place of business located at 804 Lebanon Drive, St. Louis, Missouri 63104.

7.     The Defendant Daniel Weness Construction ("Weness") is a corporation incorporated under the laws of the State of Minnesota having its principal place of business located at 11384 790th Avenue, LeRoy, Minnesota 55951.

2

8.    The Defendant Western States Tower, LLC ("WST") is a corporation incorporated under the laws of the State of Nevada having its principal place of business located at 1475 Terminal Way #A-5, Reno, Nevada 89502.

9.    The Defendant West Central Consulting Services, Inc. ("WCCS") is a corporation incorporated under the laws of Texas having its principal place of business at 23302 Margerstadt, Hockley, Texas 77447.

10.    The Defendant Global Tower Service ("Global") is a corporation incorporated under the laws of the State of Illinois having its principal place of business located at 810 34th Avenue, Moline, Illinois 61265.

11.    The Defendant Advanced Lightning Technology, Ltd. ("Advanced") is a corporation incorporated under the laws of the State of Texas having its principal place of business located at 122 Leesley Lane, Argyle, Texas 76226.

12.    The Defendant Gulf Coast Steeplejack ("Gulf Coast") is a corporation incorporated under the laws of the State of Texas having its principal place of business located at 1994 FM 356 N, Onalaska, Texas 77360.

13.    The Defendant Stewart Electric, Inc. ("Stewart") is a corporation incorporated under the laws of the State of Mississippi having its principal place of business located at 118 Creekmore, Greenville, Mississippi 38701.

**JURISDICTION**

14.    The United States District Court for the District of Massachusetts has proper jurisdiction over this matter by reason of complete diversity of citizenship of the party corporations and the jurisdictional amount in controversy.  28 U.S.C.A. § 1332 and §

3

1335. The matter in controversy exceeds, exclusive of interest and costs, Seventy-Five Thousand Dollars and 01/100 ($75,000.01).

## FACTUAL BACKGROUND

### I.     The Master Contracting Agreement

15.     The Plaintiff American Tower is the parent company of ATC Tower Services, Inc. ("ACS"), a subsidiary corporation incorporated in New Mexico having its principal place of business in the Commonwealth of Massachusetts, which provides construction and development services for wireless and broadcast communication towers leased by American Tower or owned or leased by third-party customers of American Tower.

16.     On or about January 1, 2003, the Plaintiff American Tower, on behalf of ACS, and the Defendant JLB entered into a Master Contractor Agreement (the "Agreement") whereby JLB agreed to provide general contracting services to ACS and American Tower at twenty-three (23) tower sites (the "Sites") located in various states across the United States.  A true and correct copy of the Agreement is attached hereto as *Exhibit 1.*

17.     Under the Agreement, a schedule and purchase order (collectively, the "Purchase Orders") was produced for each site designating the site, the work to be completed and the contract price.  True and correct copies of the Purchase Orders are attached hereto at *Exhibit 2.*

18.     Under Article 7 of the Agreement, the Defendant JLB agreed to participate in and oversee the performance and completion of work at each of the Sites.

4

19.     Under Article 9.1 of the Agreement, American Tower agreed to pay JLB for the completion of the Work at each of the Sites.[1]

20.     Pursuant to Article 4.7.1 of the Agreement, JLB was given the authority to hire subcontractors in order to complete the work at each of the Sites in exchange for payment by ACS to JLB and by JLB to the subcontractors for all work completed, so long as permission of the Plaintiff was granted in writing with regard to the hiring of the particular subcontractor pursuant to Article 6.3 of the Agreement.

21.     JLB is responsible for all payments to the subcontractors for work performed at the Sites.

22.     American Tower reserved the right, pursuant to Articles 4.7.2 and 4.7.3 of the Agreement, to make payments to a subcontractor directly in the event that JLB failed to pay any subcontractor as promised.[2]

23.     The Agreement (Article 4.7.3) states further that JLB will reimburse American Tower for "all costs of collection, including but not limited to, reasonable attorneys' fees, collection fees and court costs incurred by [American Tower] to collect properly due payments, or payments due and owing to subcontractors....".

---

[1] The Agreement calls for Eighty-Five Percent (85%) of the "Contract price (sic) [to] be paid upon satisfaction of the following:  (a) completion of the relevant Work, (b) inspection and approval by [American Tower's] representative of the relevant Work, (c) acceptance of the relevant work by [American Tower], (d) receipt by [American Tower] of Contractor's invoice for the relevant Work, (e) receipt by [American Tower] of all required releases, waivers of liens and other documents listed in the Contract Documents, and (e) (sic) no claims, stop notices or liens arising out of the relevant Work have been made or remain in effect."

[2] The Agreement (Article 4.7.2) states that "if [American Tower] has reason to believe that [JLB] is not timely paying its subcontractors, Contractor agrees that [American Tower] shall have the right to make any payment due hereunder to Contractor jointly to Contractor and to any person, subcontractor, supplier or other entity to whom Contractor is indebted for labor performed or materials furnished in the performance of the Work."

## II.    The Purchase Orders, Sites and Subcontractors

*The Bayou LaBatre Site*

24.    The Contract Price from ACS to JLB for the Bayou LaBatre site in Irvington, Alabama[3] was Seventeen Thousand Five Hundred Dollars ($17,500.00).

25.    Prime, the subcontractor hired by JLB to perform work on the Bayou LaBatre site, is allegedly owed Sixteen Thousand One Hundred Dollars ($16,100.00) for that site.

26.    In order to complete the project at the Bayou LaBatre site, ACS spent an additional Three Thousand Dollars ($3,000.00).

27.    To date, neither JLB, nor Prime, has been paid by ACS  for the Bayou LaBatre site.

*The Chapel Church Site*

28.    The Contract Price from ACS to JLB for the Chapel Church site in Grand Bay, Alabama[4] was Seventeen Thousand Dollars ($17,000.00).

29.    Piedmont[5] and RSC[6], the subcontractors hired by JLB to perform work on the Chapel Church site, were paid Nine Thousand Six Hundred Dollars ($9,600.00) and Two Thousand Five Hundred Fifty-Five Dollars and 85/100 ($2,555.85), respectively, by ACS for that site.

30.    In order to complete the project at the Chapel Church site, ACS spent an additional Nine Hundred Dollars ($900.00).

---

[3] Also referenced in the Plaintiff's documents as Project # 22792 and Purchase Order # 54318.
[4] Also referenced in the Plaintiff's documents as Project # 22791 and Purchase Order # 54321.
[5] Piedmont is not a party to this action.
[6] RSC is not a party to this action.

31.    To date, the subcontractors have been paid Twelve Thousand One Hundred

Fifty-Five Dollars and 85/100 ($12,155.85) by ACS for the Chapel Church site.

*The China Wok Site*

32.    The contract price from ACS to JLB for the China Wok site in Rock Hill, Missouri[7]

was Six Thousand Five Hundred Dollars ($6,500.00).

33.    Prime, the subcontractor hired by JLB to perform work on the China Wok site, is

allegedly owed Four Hundred Fifty Dollars ($450.00) for that site.

34.    In order to complete the project at the China Wok site, ACS spent an additional

One Hundred Seventy-Five Dollars ($175.00).

35.    To date, ACS has paid JLB Six Thousand Five Hundred Dollars ($6,500.00) for

the China Wok site.

*The Claiborne Site*

36.    The contract price from ACS to JLB for the Claiborne site in Gosport, Alabama[8]

was Eighteen Thousand Dollars ($18,000.00).

37.    Global, the subcontractor hired by JLB to perform work on the Claiborne site,

was paid Ten Thousand Nine Hundred Fifty Dollars ($10,950.00) by ACS for that site.

38.    In order to complete the project at the Claiborne site, ACS spent an additional

Three Thousand Six Hundred Dollars ($3,600.00).

39.    To date, Global has been paid Ten Thousand Nine Hundred Fifty Dollars

($10,950.00) by ACS for the Claiborne site.

---

[7] Also referenced in the Plaintiff's documents as Project # 22680 and Purchase Order # 50639.
[8] Also referenced in the Plaintiff's documents as Project # 22799 and Purchase Order # 52365.

*The Cleveland Site*

40.    The contract price from ACS to JLB for the Cleveland site in Cleveland, Mississippi[9] was Nineteen Thousand Eight Hundred Dollars ($19,800.00).

41.    WCCS, Stewart, Advanced and Prime, the subcontractors hired by JLB to perform work on the Cleveland site, have presented unpaid claims to ACS for Twenty Four Thousand Eight Hundred Dollars ($24,800.00), One Thousand Thirty-Three Dollars and 62/100 ($1,033.62), Five Thousand Six Hundred Ninety Dollars and 89/100 ($5,690.89) and Three Thousand Five Hundred Seventy-Six Dollars and 50/100 ($3,576.50), respectively, for that site.

42.    On information and belief, Gulf Coast performed work at the Cleveland site pursuant to an agreement with WCCS and may be owed money for the work performed at the site.

43.    To date, none of the parties have been paid by ACS for the Cleveland site.

*The Columbus Site*

44.    The contract price from ACS to JLB for the Columbus site in Columbus, Mississippi[10] was Seven Thousand Dollars ($7,000.00).

45.    WST and Prime, the subcontractors hired by JLB to perform work at the Columbus site, are allegedly owed Four Thousand One Hundred Thirty-Five Dollars ($4,135.00) and Four Thousand Two Hundred Sixty-Five Dollars and 50/100 ($4,265.50), respectively, for that site.

46.    To date, ACS has paid JLB Seven Thousand Dollars ($7,000.00) for the Columbus site.

---

[9] Also referenced in the Plaintiff's documents as "G523", Project #22840 and Purchase Order #52634.
[10] Also referenced in the Plaintiff's documents as "C501", Project #22842 and Purchase Order #52812.

8

*The Forney Site*

47.    The contract price for the Forney site in Forney, Texas[11] was Twenty Six Thousand Dollars ($26,000.00).

48.    TNT Electric[12] and Americrane[13], the subcontractors hired by JLB to perform work at the Forney site, were paid Seventeen Thousand Five Hundred Dollars ($17,500.00) and Two Thousand One Hundred Dollars ($2,100.00), respectively, by ACS for that site.

49.    To date, ACS has paid TNT Electric and Americrane Nineteen Thousand Six Hundred Dollars ($19,600.00) for the Forney site.

*The Fowl River Site*

50.    The contract price from ACS to JLB for the Fowl River site in Mobile, Alabama[14] was Eighteen Thousand Dollars ($18,000.00).

51.    Prime and Global, the subcontractors hired by JLB to perform work at the Fowl River site, are allegedly owed Thirteen Thousand Seven Hundred Dollars ($13,700.00) and One Thousand Five Hundred Dollars ($1,500.00), respectively, for the site.

52.    In order to complete the project at the Fowl River site, ACS spent an additional Three Thousand Six Hundred Dollars ($3,600.00).

53.    To date, none of the parties have been paid by ACS for the Fowl River site.

*The Graytak Site*

54.    The contract price from ACS to JLB for the Graytak site in Pine Lawn, Missouri[15] was Nineteen Thousand Five Hundred Dollars ($19,500.00).

---

[11] Also referenced in the Plaintiff's documents as Project #23651 and Purchase Order #55437.
[12] TNT Electric is not a party to this action.
[13] Americrane is not a party to this action.
[14] Also referenced in the Plaintiff's documents as Project #22793 and Purchase Order #53776.

9

55.    AMF, one of the subcontractors hired by JLB to perform work at the Graytak site, was paid Fifteen Thousand Eight Hundred Dollars ($15,800.00) by ACS for that site.

56.    Prime, one of the subcontractors hired by JLB to perform work at the Graytak site, is allegedly owed a total of Six Thousand Eight Hundred Fifty Dollars ($6,850.00) for that site.

57.    In order to complete the project at the Graytak site, ACS spent an additional Three Thousand Five Hundred Five Dollars ($3,505.00).

58.    To date, ACS has paid AMF Fifteen Thousand Eight Hundred Dollars ($15,800.00) for the Graytak site.

*The Hwy 25N Site*

59.    The contract price from ACS to JLB for the Hwy 25N site in Sturgis, Mississippi[16] was Nine Thousand Dollars ($9,000.00).

60.    WST and Prime, the subcontractors hired by JLB to perform work at the Hwy 25N site, are allegedly owed One Thousand Five Hundred Dollars ($1,500.00) and Eight Thousand One Hundred Dollars ($8,100.00), respectively, for that site.

61.    To date, none of the parties have been paid by ACS for the Hwy 25N site.

*The I-59N Site*

62.    The contract price from ACS to JLB for the I-59N site in Hattiesburg, Mississippi[17] was Six Thousand Dollars ($6,000.00).

63.    WST, the subcontractor hired by JLB to perform work at the I-59N site, is owed Four Thousand Two Hundred Dollars ($4,200.00) for that site

---

[15] Also referenced in the Plaintiff's documents as Project #21785 and Purchase Order #50637.
[16] Also referenced in the Plaintiff's documents as "C554", Project #22768 and Purchase Order #54855.
[17] Also referenced in the Plaintiff's documents as "H524", Project #22847 and Purchase Order #52635.

64.    To date, ACS has paid JLB Six Thousand Dollars ($6,000.00) for the I-59N site.

*The Lado Road Site*

65.    The contract price from ACS to JLB for the Lado Road site in Zephyrhills,

Florida[18] was Five Thousand Dollars ($5,000.00).

66.    Daniel Weness, the subcontractor hired by JLB to perform work at the Lado

Road site, is allegedly owed Three Thousand Eight Hundred Dollars ($3,800.00) for that

site.

67.    To date, ACS has paid JLB Five Thousand Dollars ($5,000.00) for that site.

*The Lake Site*

68.    The contract price from ACS to JLB for the Lake site in Lake Wales, Florida[19]

was Five Thousand Dollars ($5,000.00).

69.    Daniel Weness and WST, the subcontractors hired by JLB to perform work at the

Lake site, were paid One Thousand Nine Hundred Dollars ($1,900.00) each by ACS for

that site.

70.    To date, ACS has paid Daniel Weness and WST Three Thousand Eight Hundred

Dollars ($3,800.00) for the Lake site.

*The Lutz Site*

71.    The contract price from ACS to JLB for the Lutz site in Lutz, Florida[20] was Five

Thousand Dollars ($5,000.00).

72.    Daniel Weness, the subcontractor hired by JLB to perform work at the Lutz site,

was paid Three Thousand Eight Hundred Dollars ($3,800.00) by ACS for that site.

---

[18] Also referenced in the Plaintiff's documents as "T114", Project #22186 and Purchase Order #50271.
[19] Also referenced in the Plaintiff's documents as "LO34", Project #22160 and Purchase Order #49841.
[20] Also referenced in the Plaintiff's documents as "T031", Project #22163 and Purchase Order #49840.

11

73.    To date, ACS has paid Daniel Weness Three Thousand Eight Hundred Dollars ($3,800.00) for the Lutz site.

*The Mauvilla Site*

74.    The contract price from ACS to JLB for the Mauvilla site in Eight Mile, Alabama[21] was Eighteen Thousand Dollars ($18,000.00).

75.    WST and RSC[22], the subcontractors hired by JLB to perform work at the Mauvilla site, were paid Seven Thousand Two Hundred Dollars ($7,200.00) and Two Thousand Nine Hundred Twenty-Five Dollars and 45/100 ($2,925.45), respectively, by ACS for that site.

76.    In order to complete the project at the Mauvilla site, ACS spent an additional Two Thousand Seven Hundred Dollars ($2,700.00).

77.    To date, ACS has paid WST and RSC Ten Thousand One Hundred Twenty-Five Dollars and 45/100 ($10,125.45) for the Mauvilla site.

*The Milton East Site*

78.    The contract price from ACS to JLB for the Milton East site in Milton, Florida[23] was Eight Thousand Five Hundred Dollars ($8,500.00).

79.    Global, the subcontractor hired by JLB to perform work at the Milton East site, was paid Four Thousand Eight Hundred Dollars ($4,800.00) by ACS for that site.

80.    In order to complete the project at the Milton East site, ACS spent an additional One Thousand Two Hundred Dollars ($1,200.00).

---

[21] Also referenced in the Plaintiff's documents as Project #22794 and Purchase Order #53334.
[22] RSC is not a party to this action.
[23] Also referenced in the Plaintiff's documents as Project #22886 and Purchase Order #53781.

12

81.    To date, ACS has paid Global Four Thousand Eight Hundred Dollars ($4,800.00) for the Milton East site.

*The MLK Site*

82.    The contract price from ACS to JLB for the MLK site in Wellston, Missouri[24] was Eight Thousand Five Hundred Dollars ($8,500.00).

83.    Prime, AMF and Heinz, the subcontractors hired by JLB to perform work at the MLK site, are allegedly owed Seven Thousand One Hundred Fifty Dollars ($7,150.00), Seven Hundred Sixty-Five Dollars ($765.00) and Eight Thousand Two Hundred Dollars ($8,200.00), respectively, for that site.

84.    In order to complete the project at the MLK site, ACS spent an additional Two Thousand Four Hundred Ninety-One Dollars ($2,491.00).

85.    To date, ACS has paid JLB Eight Thousand Five Hundred Dollars ($8,500.00) for the MLK site.

*The Nacogdoches Site*

86.    The contract price from ACS to JLB for the Nacogdoches site in Abilene, Texas[25] was Twenty-Six Thousand Dollars ($26,000.00).

87.    TNT Electric[26], the subcontractor hired by JLB to perform work at the Nacogdoches site, was paid Twenty-One Thousand Two Hundred Three Dollars ($21,203.00) by ACS for the site.

88.    To date, ACS has paid TNT Electric Twenty-One Thousand Two Hundred Three Dollars ($21,203.00) for the Nacogdoches site.

---

[24] Also referenced in the Plaintiff's documents as Project # 21735 and Purchase Order #50640.
[25] Also referenced in the Plaintiff's documents as Project #23649 and Purchase Order #56183.
[26]  TNT Electric is not a party to this action.

*The Nordyne-B Site*

89.    The contract price from ACS to JLB for the Nordyne-B site in St. Louis, Missouri[27] was Thirteen Thousand One Hundred Dollars ($13,100.00).

90.    AMF, the subcontractor hired by JLB to perform work at the Nordyne-B site, is allegedly owed Eleven Thousand Four Hundred Forty-Nine Dollars ($11,449.00) for that site.

91.    In order to complete the project at the Nordyne-B site, ACS spent an additional Three Hundred Fifty-One Dollars ($351.00).

92.    To date, ACS has paid JLB Thirteen Thousand One Hundred Dollars ($13,100.00) for the Nordyne-B site.

*The Plant City Site*

93.    The contract price from ACS to JLB for the Plant City site in Kissimmee, Florida[28] was Two Thousand Five Hundred Dollars ($2,500.00).

94.    IG Wireless[29], the subcontractor hired by JLB to perform work at the Plant City site, was paid Three Thousand Two Hundred Dollars ($3,200.00) by JLB for that site.

95.    JLB provided an executed conditional waiver and release of lien upon payment in the amount of Five Thousand Dollars ($5,000.00), dated May 12, 2004.

96.    The Defendant JLB is allegedly owed Two Thousand Five Hundred Dollars ($2,500.00) for the Plant City site.

---

[27]Also referenced in the Plaintiff's documents as Project #21765 and Purchase Order #53233.
[28] Also referenced in the Plaintiff's documents as Project #22535 and Purchase Order #51646.
[29]  IG Wireless is not a party to this action.

*The Roofers Supply Site*

97.    The contract price from ACS to JLB for the Roofers Supply site in St. Louis, Missouri[30] was Eight Thousand Five Hundred Dollars ($8,500.00).

98.    AMF, one of the subcontractors hired by JLB to perform work at the Roofers Supply site, was paid One Thousand Fifty-Five Dollars ($1,055.00) by ACS for that site.

99.    Prime, one of the subcontractors hired by JLB to perform work at the Roofers Supply site, is allegedly owed Nine Thousand Three Hundred Fifty Dollars ($9,350.00) for that site.

100.    In order to complete the work at the Roofers Supply site, ACS spent an additional One Thousand Two Hundred Twenty-Eight Dollars ($1,228.00).

101.    To date, ACS has paid AMF One Thousand Fifty-Five Dollars ($1,055.00) for the Roofers Supply site.

*The Sunflower Site*

102.    The contract price from ACS to JLB for the Sunflower site in Sunflower, Mississippi[31] was Twenty-Five Thousand Dollars ($25,000.00).

103.    WCCS, Stewart and Prime, the subcontractors hired by JLB to perform work at the Sunflower site, are allegedly owed Thirty Six Thousand Six Hundred Five Dollars ($36,605.00), Eight Thousand Two Hundred Eighty-Two Dollars and 50/100 ($8,282.50) and Six Thousand Two Hundred Nineteen Dollars and 50/100 ($6,219.50), respectively.

104.    On information and belief, Gulf Coast performed work at the Sunflower site pursuant to an agreement with WCCS and may be owed money for the work performed at the site.

---

[30] Also referenced in the Plaintiff's documents as Project #22552 and Purchase Order #50642.
[31] Also referenced in the Plaintiff's documents as "G580", Project #22770 and Purchase Order #52632.

105.    To date, none of the parties have been paid by ACS for the Sunflower site.

*The Sunflower Site Modifications*

106.    The contract price for the modifications[32] to the Sunflower site[33] in Sunflower,

Mississippi was Ten Thousand One Hundred Fifty-Five Dollars ($10,155.00).

107.    To date, no payments have been made for the modifications to the Sunflower

site.

*The UWF Hospital Site*

108.    The contract price from ACS to JLB for the UWF Hospital site in Pensacola,

Florida[34] was Eighteen Thousand Five Hundred Dollars ($18,500.00).

109.    Piedmont[35], A & J Electric[36] and Ravonte[37], the subcontractors hired by JLB to

perform work at the UWF Hospital site, were paid Ten Thousand Dollars ($10,000.00),

Two Thousand Six Hundred Thirty-Three Dollars and 33/100 ($2,633.33) and Eight

Hundred Forty Three Dollars and 33/100 ($843.33), respectively, by ACS, for that site.

110.    To date, ACS has paid Piedmont, A & J Electric and Ravonte Thirteen Thousand

Four Hundred Seventy-Six Dollars and 66/100 ($13,476.66) for the UWF Hospital site.

**III.    The Factoring Agreement**

111.    On information and belief, on or about December 12, 2003, Jason L. Bentley, on

behalf of JLB, entered into an on-line factoring agreement with Capital Factors, Inc.

("CFI"), a lending corporation which later became a part of Capital, assigning a certain

unascertained portion of JLB's accounts receivable due under the Agreement to Capital.

---

[32] Please refer to Article 5 of the Agreement for an explanation of procedure with regard to modifications.
[33] Also referenced in the Plaintiff's documents as "G580", Project #23211 and Purchase Order #54488.
[34] Also referenced in the Plaintiff's documents as Project #23061 and Purchase Order #54316.
[35] Piedmont is not a party to this action.
[36] A&J Electric is not a party to this action.
[37] Ravonte is not a party to this action.

112.    On or about July 13, 2004, Capital began to demand payment from ACS for work performed under the Agreement, and instructed ACS not to forward any further payment to JLB.

113.    Pursuant to Article 4.1.9 of the Agreement, JLB was responsible for "promptly provid[ing] information to ATC that may affect the Contract Documents...".

114.    Pursuant to Article 6.3 of the Agreement, JLB "shall not subcontract, assign or transfer the Work, any Schedule, PO or this Agreement, or any portion thereof, without the prior written consent of ATC...".

115.    The Plaintiffs were neither given notice of, nor asked permission for, JLB's assignment of the accounts receivable under the Agreement.

## IV.    Liens

116.    On or about August 16, 2004, WCCS filed a notice of intent to lien and a notice of labor and materialman's lien for the Cleveland site and the Sunflower site.

117.    On or about March 24, 2004, JLB provided a Release of Claims related to the China Wok site.

118.    On or about March 24, 2004, JLB provided a Release of Claims related to the MLK Site.

119.    In accordance with Article 4.7.4 of the Agreement, JLB waived its right, and the rights of any subcontractors with whom it contracted, to place any mechanics' liens or other liens on any of the Sites.

120.    JLB did not complete all of the work at a number of Sites as agreed in the original Scope of Work as defined for each site, thereby causing ACS to incur additional monies and expenses in order to complete the work.

## V.    The Final Amounts Due and Owing

121.    To date, ACS has paid directly to JLB Forty-Six Thousand One Hundred Dollars ($46,100.00) in accordance with the Agreement.

122.    To date, ACS has paid directly to certain subcontractors One Hundred Sixteen Thousand Seven Hundred Sixty Five Dollars and 96/100 ($116,765.96).

123.    To date, ACS has paid additional monies or incurred additional costs beyond the contract price for certain sites in the amount of Twenty-Two Thousand Seven Hundred Fifty Dollars ($22,750.00).

124.    Under the Agreement, ACS maintains that it now owes JLB a total of One Hundred Thirty-Two Thousand Four Hundred Thirty-Nine Dollars and 04/100 ($132,439.04) in full satisfaction of the Agreement.  This was calculated by the following analysis: Original Contract Price, minus payments to Subcontractors paid directly by ACS, minus payments made to JLB by ACS, minus additional monies paid by or costs incurred by ACS for the completion of the various projects at the Sites.

125.    Based on the foregoing, it appears that JLB is responsible to ACS for the payment and resolution of existing Subcontractor claims which total of One Hundred Eighty-Seven Thousand Seven Hundred Twenty-Two Dollars and 51/100 ($187,722.51).

126.    Capital is demanding payment on the accounts receivable from ACS under the Agreement in the amount of Fifty-One Thousand Two Hundred Eighty-Three Dollars ($51,283.00).

127.    On information and belief, no additional payments have been made to the subcontractors by JLB or Capital.

## CLAIMS FOR RELIEF

### <u>COUNT I</u>
### (Breach of Contract)
### (American Tower Corporation v. J.L.B. Construction, Inc.)

128.    The Plaintiff incorporates by reference herein the allegations contained in Paragraphs 1-127, as though fully set forth herein.

129.    On or about January 1, 2003, the Plaintiff and the Defendant JLB entered into an Agreement whereby the Defendant JLB would provide general contracting services for twenty-three (23) Sites leased by the Plaintiff or owned or leased by third-party customers of American Tower.

130.    The Defendant JLB breached the Agreement by failing to complete the general contracting services, failing to obtain the permission of the Plaintiff before assigning a portion of the Agreement to Capital, failing to give notice to the Plaintiff of a material change in the Agreement, failing to obtain lien waivers from all of the subcontractors and failing to pay all of the subcontractors.

131.    The Agreement (Article 4.7.3) states that JLB will reimburse American Tower for "all costs of collection, including but not limited to, reasonable attorneys' fees, collection fees and court costs incurred by [American Tower] to collect properly due payments, or payments due and owing to subcontractors....".

   **WHEREFORE**, the Plaintiff seeks judgment against the Defendant JLB for a sum to be determined at trial, plus interest, attorneys' fees and court costs.

## COUNT II
### (Fraud)
### (American Tower Corporation v. J.L.B. Construction, Inc.)

132.    The Plaintiff incorporates by reference herein the allegations contained in Paragraphs 1-131, as though fully set forth herein.

133.    By its words, signatures and conduct, the Defendant JLB materially misrepresented certain facts to the Plaintiff regarding its ability and wherewithal to complete the Site projects, thereby causing the Plaintiff to enter into the Agreement for the construction of the twenty-three (23) Sites.

134.    The Defendant JLB assigned portions of the Agreement for accounts receivable to Capital without notifying or obtaining the permission of the Plaintiff.

135.    Further, the Defendant JLB authorized work at a number of the sites in an amount greater than the contract price for each site.

136.    The subcontractors performed work and the Defendant JLB has failed to pay the subcontractors for valid work.

137.    The Plaintiff reasonably relied on the representations of the Defendant JLB to its detriment.

   **WHEREFORE,** the Plaintiff has suffered monetary damages as a result of the Defendant's fraudulent conduct and demands judgment against the Defendant in an amount to be proven at trial, plus interest and court costs.

## COUNT III
### (Indemnification)
### (American Tower Corporation v. J.L.B. Construction, Inc.)

138.    The Plaintiff incorporates by reference herein the allegations contained in Paragraphs 1-137, as though fully set forth herein.

139.    JLB is responsible to the Plaintiff for the payment and resolution of existing to subcontractor claims for valid work performed at all of the Sites in the amount of One Hundred Eighty-Seven Thousand Seven Hundred Twenty-Two Dollars and 51/100 ($187,722.51).

140.    The Plaintiff neither hired, nor approved, of any of the subcontractors hired to perform work at the sites.

141.    The Plaintiff was never given notice of the additional charges, nor did it authorize the work to be performed.

142.    JLB has neglected and refused to pay the amounts due to the subcontractors.

143.    The Plaintiff has already directly paid One Hundred Sixteen Thousand Seven Hundred Sixty-Five Dollars and 96/100 ($116,765.96) to certain subcontractors.

144.    The Agreement (Article 4.7.3) states that:

> if [American Tower] has reason to believe that [JLB] is not timely paying its subcontractors, Contractor agrees that [JLB] shall have the right to make any payment due hereunder to Contractor jointly to Contractor and to any person, subcontractor, supplier or other entity to whom Contractor is indebted for labor performed or materials furnished in the performance of the Work.

145.    The Agreement states further in Article 4.6 that:

> [Contractor agrees], to the fullest extent permitted by law, to indemnify, defend and hold harmless the Project Site Owner, [American Tower's] Customer, [American Tower], its subsidiary and affiliated companies and their respective directors, officers, employees, agents and assigns from and against any and all claims, damages, losses, judgments, liens, demands, liabilities and expenses of every nature and kind, including but not limited to...reasonable attorneys' fees, expert witness fees and court costs arising out of, related to or resulting from a) Contractor's performance of the Work, b) the acts or omissions of Contractor [or] Contractor's subcontractors..., c) the breach of any of the provisions of this Agreement by Contractor, its subcontractors...., or d) any claim of infringement of any patent.

21

146.    On or about December 2, 2003, the Defendant JLB entered into a factoring agreement with Capital and is liable for any damages arising out of any claims made by Capital.

147.    The Plaintiff never consented to any agreement with Capital.

148.    The Plaintiff was never given any notice, nor asked permission by the Defendant JLB, to enter into an agreement with Capital for the factoring of the accounts receivable under the Agreement.

149.    JLB has denied that there is an enforceable factoring agreement.

150.    In the event of recovery by any of the Defendants on any matter or claim arising from the Defendant JLB's breach of this Agreement or its assignment of the accounts receivable to Capital, the Plaintiff will be entitled to full and complete indemnification from the Defendant JLB for damages, fees, costs and expenses related thereto.

**WHEREFORE**, the Plaintiff demands judgment against the Defendant JLB for indemnification related to any and all damages awarded against the Plaintiff and any and all fees, costs and expenses incurred by the Plaintiff in defending same.

**COUNT IV**
**(Contribution)**
**(American Tower Corporation v. J.L.B. Construction, Inc.)**

151.    The Plaintiff incorporates by reference herein the allegations contained in Paragraphs 1-150, as though fully set forth herein.

152.    The Defendant JLB hired the subcontractors to perform work at each of the Sites.

153.    At no time did the Plaintiff agree in writing to hire subcontractors for work performed at the Sites and at no time did the Plaintiff authorize the additional charges above and beyond the contract price for each site.

154.    On or around December 2, 2003, the Defendant JLB entered into a factoring agreement with Capital relating to the accounts receivable pursuant to the Agreement and related work.

155.    At no time did the Plaintiff consent to the factoring agreement between the Defendant JLB and the Defendant Capital.

156.    In the event that any Defendant recovers judgment against the Plaintiff, the Plaintiff will be entitled to judgment against the Defendant JLB for contribution toward damages and costs awarded said Defendant(s).

**WHEREFORE**, the Plaintiff demands judgment against the Defendant JLB for contribution relating to all damages and/or costs awarded against the Plaintiff.

### COUNT V
### (Interpleader)
### (American Tower Corporation v. All Defendants)

157.    The Plaintiff incorporates by reference herein the allegations contained in Paragraphs 1-156, as though fully set forth herein.

158.    On or about January 1, 2003, the Plaintiff American Tower, on behalf of ACS, and the Defendant JLB entered into a Master Contractor Agreement whereby JLB agreed to provide general contracting services to ACS and American Tower at twenty-three (23) Sites located in a number of states across the United States.

159.   Pursuant to Article 4.7.1 of the Agreement, JLB was given the authority to hire subcontractors in order to complete the work at each of the Sites in exchange for payment by American Tower to JLB for all work completed.

160.   Under Article 9.1 of the Agreement, American Tower agreed to pay JLB for the completion of the Work at each of the sites.

161.   American Tower reserved the right, under Article 4.7.2 of the Agreement, to make payments to a subcontractor directly in the event that JLB failed to pay any subcontractor as promised.

162.   On information and belief, on or about December 12, 2003, Jason L. Bentley, on behalf of JLB, entered into an on-line factoring agreement with Capital Factors, Inc. ("CFI"), a lending corporation which later became a part of Capital, assigning a certain unascertained portion of JLB's accounts receivable due under the Agreement with ATC to Capital.

163.   To date, ACS has paid Forty-Six Thousand One Hundred Dollars ($46,100.00) to JLB in accordance with the Agreement for such Sites.

164.   To date, ACS has paid certain subcontractors One Hundred Sixteen Thousand Seven Hundred Sixty Five Dollars and 96/100 ($116,765.96).

165.   To date, ACS has paid additional monies and incurred additional costs beyond the contract price for certain sites in the amount of Twenty-Two Thousand Seven Hundred Fifty Dollars ($22,750.00).

166.   Under the Agreement, ACS believes it now owes JLB a total of One Hundred Thirty-Two Thousand Four Hundred Thirty-Nine Dollars and 04/100 ($132,439.04) (the "Interpleader Amount") in full satisfaction of the Agreement.

24

167.    Based on the foregoing, JLB is responsible to Plaintiff for the payment and resolution of existing Subcontractor claims against JLB and the Plaintiff which total One Hundred Eighty-Seven Thousand Seven Hundred Twenty-Two Dollars and 51/100 ($187,722.51).

168.    Capital is demanding payment on the accounts receivable from ACS under the Agreement in the amount of Fifty-One Thousand Two Hundred Eighty-Three Dollars ($51,283.00).

169.    By reason of these conflicting claims, Plaintiff is uncertain as to the amount, if any, of the remaining remuneration under the Agreement that is owed to each Defendant.

170.    As a result of the aforesaid conflicting claims and demands, the Plaintiff is potentially exposed to multiple liability.

171.    The Plaintiff is entitles to interpleader pursuant to Rule 22 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1335.

**WHEREFORE**, the Plaintiff requests this Honorable Court enter an order (i) allowing the Plaintiff to interplead the Interpleader Amount into the Registry of the Court; (ii) restraining each of the Defendants from instituting any action against the Plaintiff for the recovery of monies under the Agreement or for work performed on the Sites; (iii) that if the Court shall determine that Plaintiff owes any monies to any Defendants under the Agreement, requiring the Defendants to interplead and settle between themselves their rights to the Interpleader Amount; (iv) discharging the Plaintiff from all other liability to the Defendants, except to the Defendants whom the Court shall adjudge are entitled

to recovery of some portion of the Interpleader Amount; and (v) granting such other and further relief as the Court my deem equitable and just under the circumstances.

**COUNT VI**
**(Declaratory Relief)**
**(American Tower Corporation v. All Defendants)**

172.    The Plaintiff incorporates by reference herein the allegations contained within Paragraphs 1-171, as though fully set forth herein.

173.    An actual and serious controversy has arisen between the Plaintiff and the Defendants as to the following:

    (A)    Whether or not the Plaintiff owes any further monies under the Agreement to the Defendant JLB or to any other Defendants;

    (B)    Whether or not the Defendant JLB is in breach of the Agreement with regard to its hiring and failure to pay subcontractors;

    (C)    Whether or not the Defendant JLB is in breach of the Agreement with regard to agreeing to payments to the subcontractors over and above the contract price under the Agreement;

    (D)    Whether or not the subcontractors who filed liens are in breach of the Agreement; and

    (E)    Whether or not the Defendant JLB must indemnify Plaintiff for all damages, fees and costs.

174.    Unless these controversies are resolved shortly, the Plaintiff and the Plaintiff's third-party customers are likely to suffer immediate and irreparable harm by the further distribution of proceeds to any of the Defendants.

175.    The Plaintiff cannot settle the existing controversy without the aid of this Court's judgment.

**WHEREFORE**, the Plaintiff requests this Court to:

a.    Enter a declaratory judgment that the Defendant JLB, the Defendant Subcontractors and the Defendant Capital are not entitled to any further payments from the Plaintiff, other than a portion, if any, of the Interpleader Amount.

b.    Enter a declaratory judgment that the Plaintiff is discharged of any liability in excess of the Interpleader Amount.

c.    Enter a declaratory judgment that the Defendant JLB is solely responsible for all remaining payments in excess of the Interpleader Amount, if any, to the subcontractors under the Agreement due to JLB's conduct and failure to obtain consent of the Plaintiff.

d.    Enter a declaratory judgment that any and all liens filed by the Defendant Subcontractors are deemed invalid and discharged.

e.    Enter a declaratory judgment that the Defendant JLB must reimburse the Plaintiff for all attorneys' fees and court costs incurred and associated with this action.

f.    And grant such further relief as the Court may deem equitable and just under the circumstances.

**THE PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,
AMERICAN TOWER
CORPORATION, INC.
By its attorneys,


/s/ Gregory J. Aceto
Gregory J. Aceto, Esq.
 (BBO No. 558556)
Erin J. Brennan, Esq.
  (BBO No. 660097)
JOHNSON & ACETO, P.C.
67 Batterymarch Street, Suite 400
Boston, MA  02110
(617) 728-0888